State ex rel. Stoutmeyer v. Duffy.

---

THE STATE OF NEVADA ex rel. DAVID STOUTMEYER
v. JAMES DUFFY et als.

NEGROES IN THE PUBLIC SCHOOLS — MANDAMUS.    Where the trustees of a public school refused to admit a negro, between the ages of six and eighteen, and a resident of the district, as a pupil into such school: *Held*, that an application for mandamus to compel such admission should be granted.

EXCLUSION OF NEGROES FROM PUBLIC SCHOOLS UNCONSTITUTIONAL.    Section 50 of the school law, (Stats. 1867, 95) in so far as it excludes negroes from the public schools, is unconstitutional.

POWER OF SCHOOL TRUSTEES TO "CLASSIFY" PUPILS.    While school trustees cannot legally deny to any (such as a negro) resident person of proper age an equal participation in the benefits of the common schools; yet it is entirely within their power to send all blacks to one school and all whites to another; or, in other words, to make such classification, whether based on age, sex, race or any other existent condition as may seem to them best.

State ex rel. Stoutmeyer *v.* Duffy.

This was an original application to the Supreme Court on the relation of David Stoutmeyer, a colored minor appearing by his father and natural guardian, Nelson Stoutmeyer, for a mandamus requiring James Duffy, S. H. Wright and M. C. Gardner, the board of trustees of the public schools in school district No. 1, in Ormsby County, to admit him into the public schools of that district. The petition set forth that David was seven years of age, a resident of the district, cleanly and neat in his habits, orderly in his deportment, tractable in his disposition, and ready cheerfully to obey and conform to all the laws, rules, usages, customs and discipline of the schools; that on April 10th, 1871, he, through his said father and natural guardian, presented a written application to said trustees for admission to such schools; and that they had failed and refused to admit him.

*T. W. W. Davies,* for Relator.

I. The constitutional and statutory provisions regulating the apportionment and distribution of the school moneys among the various counties and school districts of this state, have invariably made the number of children, irrespective of race or color, the basis of apportionment. It is clear that any apportionment on such a basis would be unequal, unfair and unjust, unless *all* the children, for whom money is received, are allowed the benefits of instruction in the public schools supported and maintained by such moneys; and that it would be unreasonable to allow money for the education of children in the public schools who are denied admission to the same. Con. of Nev., Art. XI, Sec. 3; Stats. 1861, 274, Sec. 2; 1862, 113, Sec. 4; 1869, 172, Sec. 32; 1869, 173, Sec. 38.

II. Section 50 of the school law, (Stats. 1867, 95) denying negroes admission to the public schools, is unconstitutional and void. It is in conflict with the constitution and laws of the United States. U. S. Con. Amendment, 14; 5 How. 410; 7 Peters, 469; 6 How. 507; 18 How. 71; 18 How. 591; 2 How. 84; 7 Wall. 321; Laws of the United States, 39th Congress, 1865–6, 27, Secs. 1 and 2; U. S. Stats. 1869–70, 144, Sec. 16; U. S. Stats. 41st Congress, 3d ses.; 42d Congress, 1st ses. No. 17, 295, Secs. 1

and 2.   If all citizens are entitled to the *same* rights, privileges and immunities, certain rights cannot be legally accorded to one class or race of citizens, and denied to another.   The section is also in conflict with that provision of the United States and state constitutions which declares that no person shall be deprived of property without due process of law, for the reason that the right to attend the public schools and receive instruction is a property right, capable of being estimated in money.   *Ex parte Garland*, 4 Wall. 344.

III.  Section 50 of the school law is also in conflict with Art. XI, Sec. 2 of the state constitution, which requires the provision by the legislature of a uniform system of common schools, by which a school shall be established and maintained in each school district, and such laws as will secure a general attendance of the children in each district upon said public schools.

IV.   The school law in as far as it legislates against a race or class of citizens on account of their color, is in the highest degree unjust and should be declared invalid and void.   If the legislature may exclude colored citizens from the public schools, there is no limitation to their power.   The question is one of power, and if we admit the power to exclude from the public schools, we must admit the power in its whole extent, as a power complete in itself, to be exercised at the discretion of the legislature and subject to no limitation or restraint, and colored citizens may be excluded from holding office, sitting on juries, visiting places of public entertainment, and the like.

V. The separation of the children in the public schools, on account of race or color, is in the nature of caste, and is a violation of equality.  It is clear that the trustees may classify scholars according to age and sex, for these distinctions are inoffensive and recognized as legal; or according to their moral and intellectual qualifications, because such a power is necessary to the government of schools.   But the legislature cannot assume, without individual examination, that an entire race possess certain moral or intellectual qualities, which renders it proper to place them all in a school by themselves.   Nor is it any good answer to say that separate schools

may be established for their instruction, because such separate schools are not the public schools designed by the constitution.

VI. The attempt to discriminate against and to abridge and impair the rights of colored citizens, comes with bad taste from the state of Nevada. It will be remembered that this state was organized in the midst of a great war, fought for the enfranchisement of the slaves and for the establishment of the great doctrine that all men are free and equal, and that, in that contest, this state enthusiastically supported that doctrine. It will be further remembered, that this state, with the utmost alacrity, ratified the thirteenth, fourteenth and fifteenth amendments to the United States constitution, the object and intent of which were to declare and fix the absolute equality of all men before the law.

*A. C. Ellis* and *R. M. Clarke* argued the case orally on behalf of the Respondent.

By WHITMAN, J.:

Relator asks a mandamus compelling defendants to admit him into the public school of which they are trustees. They object that the remedy sought should not be granted, first: because they have not the power to admit, nor to deny admission; second: because the applicant is a negro.

The power to admit to the public schools is not in words conferred upon trustees in this state, but it is so inseparably connected with their specified powers, and so inevitably a conclusion therefrom, that no argument is needed to prove its necessary existence. Stats. 1864–5, 413; 1867, 89. The trustees have general control and supervision; and while they may not see fit to require any applicant for school privileges to obtain from them an order of admission, they have the power to make such a regulation; and upon the other hand, every person qualified under the law to attend the public schools is entitled to such an order upon due demand.

The question then is, what qualifies a person to receive such an order. The applicant must be over six and under eighteen years of age, and ordinarily a resident of the district where admission is sought. So being, it is contended for relator that admission fol-

lows as of absolute right.    While it would probably be unsafe to
admit the proposition in its stated breadth; as it might be subject
to qualification by reasonable rule, as to moral obliquity or mental
incapacity; it may be accepted for this case, wherein it is unnec-
essary to look minutely into the matter, as the only ground for
refusal here was the race of the applicant.    The trustees yield
obedience to the statute, which prescribes that " Negroes, Mongol-
ians and Indians shall not be admitted into the public schools, but
the board of trustees may establish a separate school for their edu-
cation, and use the public school funds for the support of the same."
Stats. 1867, 95, Sec. 50.    To this relator replies, that such statute
is opposed to the constitution and laws of the United States; and
to the constitution of the state of Nevada.

While it may be, and probably is, opposed to the spirit of the
former, still it is not obnoxious to their letter; and as no judicial
action is more dangerous than that most tempting and seductive
practice of reading between the written lines, and interpolating a
spirit and intent other than that to be reached by ordinary and
received rules of construction or interpretation; such course will
be declined, and reference at once had to the constitution of this
state.    What says that?    " The legislature shall provide for an
uniform system of common schools, by which a school shall be es-
tablished and maintained in each school district at least six months
in every year;        *        *        *        and the legislature may pass
such laws as will tend to secure a general attendance of the chil-
dren in each school district upon said public school."    Const. Art.
XI, Sec. 2.    It is further provided in that article, of certain
pledged revenues, that " the interest thereon shall, from time to
time, be apportioned among the several counties in proportion to
the ascertained numbers of the persons between the ages of six
and eighteen years in the different counties, ´        *        *        *        "
Section 3.

These are the only references made to, or designation of, the
beneficiaries of the school fund.    Either something or nothing is
provided as to such.    If the constitution provides anything in the
language quoted, it provides for the education of all children of
the state, between the ages of six and eighteen years; by means

of an uniform system of common schools, open six months at least every year, and that the legislature may legislate to secure a general attendance thereon.   Waiving the point that "may" should read "shall" in the last sentence; yet when the legislature has acted, can it be said to have done so in accordance with the constitution when it prohibits the attendance of any children within the stated ages upon the schools erected as common schools, and supported by the funds pledged thereto?   Can such schools be schools common to all children of appropriate age; or upon an uniform system, when any such children are excluded?   It may be said that the constitution nowhere in express terms provides for the education of all children within certain ages.   If so, then it nowhere provides for the education of any.   If any are provided for, then all are.   If all are not, then none are; and the legislature may divert from the education of youth between the ages of six and eighteen, and expend upon the entire community, or upon any portion it may see fit, the funds which it has been universally supposed were solemnly and irrevocably pledged to the former purpose. Of course this possible result does not prove anything of itself; but its contemplation may serve to turn the otherwise unwilling mind to a natural construction of the constitutional language.   If the reading suggested be the proper one, and I think it is, then the action of the legislature in passing Section 50 of the school law quoted was unconstitutional; and the trustees erred when they conceived themselves bound thereby and acted thereunder, as the same was void.

My conclusion is that certain funds are pledged and certain taxation allowed for the support of common schools, which are public and open to be enjoyed by all resident children between the ages of six and eighteen years; subject, perhaps, to some qualification as before suggested.   So it has been held in Massachusetts under a constitution no more specific upon the subject than that of this state, and in Michigan under a statute similar to the one under consideration, minus its fiftieth section.   *Roberts* v. *Boston*, 5 Cush. 198; *People* v. *The Board of Education of Detroit*, 18 Mich. 400.   This general position is, however, to be taken subject to the very great powers of the trustees to arrange and classify the schools

as they deem for the best interest of the scholars. While on the one hand they may not deny to any resident person of proper age an equal participation in the benefits of the common schools ; and while in the present case upon the facts presented, the defendants should have admitted the relator into the public school in question ; yet, on the other hand, it is perfectly within their power to send all blacks to one school, and all whites to another ; or, without multiplying words, to make such a classification, whether based on age, sex, race, or any other existent condition, as may seem to them best. *Van Camp* v. *Board of Education of Logan*, Y. O. S. 406 ; *Roberts* v. *Boston*, 5 Cush. 198.

Whether it be well or ill to classify or divide, on either or all of the conditions suggested, or upon any other, is entirely within the discretion of the trustees, acting intelligently within their powers.

I think the mandamus should be ordered.

By LEWIS, C. J., concurring specially.

I cannot concur in the view taken by my brother Whitman, of that section of the constitution upon which his conclusion is founded ; but it is very clear to my mind that the act in question, so far as it prohibits the admission of negroes to the public schools, is in direct conflict with Section 21 of the constitution, which declares that "in all cases enumerated in the preceding section, and in all other cases where a general law can be made applicable, all laws shall be general and of uniform operation throughout the state."

One of the great fundamental principles underlying our government, as indeed it must be an indispensable element of all truly republican governments, is, that every citizen is equal before the law, being entitled to all the protection which it grants to life and property, and all the immunities and advantages which it may afford for culture or the amelioration of the condition of any individual or class. This has always been recognized as an essential principle of our form of government, not only by the theoretical writers upon the subject, and by all the distinguished statesmen of our country, but is the uniform language of the courts wherever the question is brought before them. Cicero tells us that the force of law consists in its being made for the whole community. Rousseau, that "it is precisely because the force of things tends always to destroy equal-

ity that the force of legislation ought always to tend to maintain it."
Locke, speaking of the law-making power, says: "They are to govern by promulgated established laws — not to be varied in particular cases, but to have one rule for rich and poor, for the favorite at court and the countryman at the plow." And this, says Cooley, "may be justly said to have become a maxim in the law by which may be tested the authority and binding force of legislative enactments." Constitutional Limitations, 392.

And again says this author: "Equality of rights, privileges and capacities unquestionably should be the aim of the law; and if special privileges are granted, or special burdens or restrictions imposed in any case, it must be presumed the legislature designed to depart as little as possible from this fundamental maxim of government. The state, it is to be presumed, has no favors to bestow, and designs to inflict no arbitrary deprivation of rights. Special privileges are obnoxious, and discriminations against persons or classes are still more so; and, as a rule of construction, are always to be leaned against, as probably not contemplated or designed."

"The rights of every individual," say the court, in *Wally's Heirs* v. *Kennedy*, "must stand or fall by the same rule or law that governs every other member of the body politic or land, under similar circumstances; and every partial or private law which directly proposes to destroy or affect individual rights, or does the same thing by affording remedies leading to similar consequences, is unconstitutional and void. Were it otherwise, odious individuals and corporations would be governed by one law, and the mass of the community and those who made the law, by another; whereas, the like general law, affecting the whole community equally, could not have been passed." 2 Yerg. 554.

Again, in the case of *Lewis* v. *Webb*, 3 Greenleaf, 326, the court use this language: "On principle, it can never be within the bounds of legitimate legislation to enact a special law or pass a resolve dispensing with the general law in a particular case, and granting a privilege and indulgence to one man by way of exemption from the operations and effect of such general law, leaving all other persons under its operation. Such a law is neither just nor reasonable in its consequences. It is our boast that we live under a government

of law and not of men, but this can hardly be deemed a blessing unless those laws have for their immovable basis the great principles of constitutional equality."

This is the great foundation principle of government, the abrogation of which must inevitably end in the ruin and destruction of our institutions. To maintain it as far as possible was undoubtedly the purpose of the section of the constitution above quoted. Why else require all laws, so far as practicable, to be general and uniform throughout the state? No other object is manifest except to give to all citizens the equal advantage of the laws, to deprive the legislature as far as possible of the power of creating distinctions, and granting immunities and exemptions to one class of citizens over another. Nothing can be conceived more obnoxious or antagonistic to this principle than the law in question. It deprives an entire class of citizens of one of the most inestimable privileges of political organization; makes the most invidious discrimination against them, exacting a revenue from their property for the organization and support of public schools, and denying them their advantages; holding them amenable to the law, but withholding from them its highest privileges.

Thus it is manifest that the law, so far as it discriminates against a class of citizens, is at least opposed to the spirit of the constitutional clause referred to. But is it opposed to the letter? To determine this it is necessary to ascertain whether the act is a general law, within the meaning of the constitution, and if not, then could a general law " be made applicable." Sedgwick, defining general and special statutes, says: " Public, or general statutes are, in England, those which relate to the kingdom at large. In this country they are those which relate to or bind all within the jurisdiction of the law-making power, limited, as that power may be, in its territorial operation or by constitutional restraints. Private or special statutes relate to certain individuals, or particular classes of men." In *Holland's case*, 4 Rep., we find a full discussion of this question. After stating the rule to be that an act is special which does not include the genus, but only the species or individuals, Coke says, in illustration of the rule: " So, mystery or trade is a general word, trade of grocery is special, and this

grocer, by name, is *individuum*; and, therefore, acts of parliament concerning mysteries or trades are general, but an act of parliament concerning the trade of grocer is a special act, as it it is said, 28 H. 8 Dyer, 27; because the trade of grocers contains under it but *individua* or singular persons, as this or that grocer by name" * * " But an act concerning all the nobility, or lords of the parliament, or all the bishops of England, or all corporations made by King Henry VI, are special and particular acts." Again: " So, observe what act to persons is general and what not. Now, know that although the matter is special, so that under it there are but *individua*, yet if it be general as to persons, thereof the judges shall take cognizance; but if the act concerns *aliquod singulare, seu individuum*, although it is general as to persons, yet the judges shall not take cognizance thereof."

I am not aware that the correctness of the general rules stated by Lord Coke in this case has been questioned, although many cases have been found where they have been misapplied. Still, the general rule is universally recognized, that a law which does not embrace all persons in the same situations or conditions, is a special law. Whenever the courts maintain a law passed for the regulation of some local or special subject, it will be observed it is done upon the ground that, although local or special in some respects, it in some way affects the entire people, or from the very nature of the subject of legislation a general law would manifestly be inapplicable. I have been unable to find any case which has held an act to be general, which extended a privilege to one class of citizens to the exclusion of others in like circumstances. To make the law general it is not perhaps necessary, under the rule of Lord Coke, that it should include all persons within the jurisdiction of the law-making power, but only that it embrace all who are in like condition, or who are embraced within a class designated by circumstances peculiar to itself. But what are the circumstances which are generally recognized as creating such class? Only age and sex, or such as *naturally* result from the social state, as the circumstance of trade, employment, profession, or the like. These conditions are the natural fruits of the political compact, depending upon no act of legislation for their creation, and such are the class

distinctions which are generally recognized by the law. In these cases, all the persons included in the class would, under Coke's rule, constitute a genus, and therefore a law including the entire class would be general, according to the case put by him of a law respecting trades, for the spirituality. But to say that any physical peculiarity, outside of that of sex, which is universally recognized, is sufficient to designate such class, is simply ridiculous. If so, the legislature might confer certain rights and privileges upon all persons possessing certain physical characteristics, to the exclusion of all others; as, for example, those having hair of a certain color, or who might be of a certain stature, and so on, dividing the people into classes by trivial distinctions, and then adopt legislation as various as the classes, and as unequal and discriminating as it might choose. That the legislative department of this state has the authority to do so will not be claimed by any person familiar with our organic law. But the legislature has no more right to designate a class by the color of the skin, than by the color of the hair. Negroes, possessing all other qualifications, are, by the highest law of the land, citizens of this state. No law now in force, or which we are bound to recognize, places them in any different position, so far as citizenship is concerned, to any other class of citizens; (the constitutional provision of this state excluding them from the right of suffrage, being now admitted to be a dead letter, obliterated in fact, as if it had never existed) they follow the same pursuits, are engaged in the same employments, may be members of the same professions, are in fact in no way marked or distinguished as a class, except by the one physical characteristic mentioned; but that alone is not, by any law or decision that has come to my knowledge, sufficient to classify them so that a law can be called general which simply embraces them, to the exclusion of all others, or embraces all others, excluding them. I conclude the law is not general which does not embrace all persons similarly situated or conditioned, and that the mere matter of color does not place a negro in a condition or situation which,.in legal contemplation, is different from other citizens. It is no answer to say, that age and sex are no more distinctive characteristics than color, and therefore that the rule which authorizes a classification by reason of

those characteristics will equally authorize a classification by color. Any classification whatever is obnoxious to the principle of equality which I have suggested, and is only, as Cooley says, permissible when unavoidable; hence classification should not be extended further than is absolutely necessary. Age and sex have always been marks of classification, both by the laws of this country and England, and are recognized by the constitution of this state, and laws passed including all persons of such classes have uniformly been held to be general. We cannot, therefore, disregard such decisions and the classifications of our own constitution, but we can refuse to make further classifications, which seem utterly unnecessary and unjust.

However, although it be not a general law, it becomes necessary still to determine whether the subject matter be such as will admit of the passage of any but a special act. It will be seen the constitution requires all laws to be general and uniform thoughout the state when such laws "can be made applicable." That this imposes the duty upon the legislature of adopting general laws where they can be made applicable, there is no question; the difficulty exists in determining what is to be understood by a law being applicable. The thing to which it is to be applicable is evidently the subject matter of legislation. It could not be said to be applicable to anything else. But what is to make a law applicable to the subject of legislation? The general definition of this word applicable is suitable, proper, appropriate, adapted.

A general law, then, can only be applicable, suitable or appropriate, when the subject concerning which the law treats or which calls for the legislation is general in its character; that is, a subject in which the entire people or class legally recognized as such have an interest. If the subject of the law, independent of the law itself, be purely local or special, in which the people at large have no interest, then clearly a general law would be inapplicable and uncalled for; it would be legislating for all the people, when the situation or condition of only a few demanded it. But if the subject of the law be one in which, from its very nature, the whole people are interested, then the legislature is required to enact a general law. To illustrate: the subject of removing the county seat

of any particular county from one locality to another is clearly a subject in which none but the people of the particular county are interested; or the case where a particular county desires to aid a railroad which is beneficial to itself alone; in neither case are the people of the state at large interested in the subject; a general law, therefore, would be utterly inapplicable to the subject matter, that is, the subject not being general, a general law would not be called for, and if adopted, would be practically inoperative in most of the state, or perhaps, operate mischievously. But the case of taxation for the purpose of carrying on the state government, the manner in which claims shall be allowed or paid by the state, and kindred matters, are subjects, the very nature of which suggest general legislation, because all the people are directly interested therein. Many similar subjects might be mentioned, but these will suffice to illustrate the construction. This interpretation is that most obviously warranted by the language of the constitution, and I think will avoid the ridiculous result of forcing the legislature to enact general laws when the subject of legislation is purely and manifestly local or special on the one hand, and the equally unhappy result on the other of allowing the legislative body to be the final judge of whether a law can be made applicable. So in effect, interpreting this injunction of the fundamental law to mean nothing but that general laws shall be passed when the legislature may think proper. With the view which I take of this clause, if the subject matter respecting which a law is passed is clearly of general interest, then the judicial department has it in its power to force general legislation respecting it in conformity with the constitution; but if not clearly of such character, then in accordance with the rule universally adopted, the action of the legislature would not be interfered with.

Can there be any doubt but the subject of education, or the control and management of the public schools, and the question as to what children shall or shall not be admitted to the privileges afforded by them, are matters of general interest? No question can be suggested in which the entire people of the state are more generally concerned. It is confined to no class, race, or locality. All who pay taxes at all contribute to the establishment and support

State ex rel. Stoutmeyer *v.* Duffy.

of the schools, and as one of the most inestimable blessings of the social compact, all are interested in the enjoyment of the advantages which they afford.   This is a subject, then, which most clearly calls for general legislation and none other.   In that the law in question denies the privilege to one class of citizens to have their children educated at these schools, it is special, and is so far void. A law including all *citizens* of the state would, doubtless, be a general law, as it would, perhaps, embrace all for whom legislation can be demanded in this state.   At least, citizenship constitutes a distinctive class recognized by the constitution of the state, and is an universal mark of classification in all governments. ‾However, it is sufficient in this case to say that whether a law which includes all *citizens*, or the children of all citizens, although expressly excluding those who are not so, may not be a general law is not decided.

As to the power of the trustees to classify scholars, putting some in one building or school and others in another, I fully agree with Judge Whitman.   So long as the same advantages of education are given to all, such classification would not interfere with the constitutional principle upon which I place my conclusion.

I therefore concur in issuing the writ.


By GARBER, J., dissenting.

In the oral argument of this cause, it was not suggested that the statute in question was in conflict with any provision of our state constitution.   The case of the relator was sought to be maintained on the ground that the statute was in violation of the fourteenth amendment to the constitution of the United States.   I fully agree with my associates that this position of counsel is utterly untenable.   The statute does not abridge any privilege or immunity of the applicant, as a citizen of the United States.   The privilege of admission to the common schools of this state is no more inherent in or connected with the *status* of citizenship than is the elective franchise ; and to secure that against unfriendly state legislation, an additional amendment was required and was proposed.   This privilege is not embraced within any meaning which has ever been attributed to the

words "life, liberty or property," and the equal protection of the laws cannot well be denied to a right which never existed.

I also quite agree with Chief Justice Lewis, that the eleventh article of our state constitution contains no provision in the slightest degree affecting the validity of this statute. The provision that the legislature *may* pass laws tending to secure a general attendance of children, was simply intended to affirm the power of the legislature to provide for compulsory education, in case the adoption of such a system should be deemed expedient. Such laws, elsewhere enacted, have been declared to be unconstitutional; and the evident and only object and scope of the provision was to set at rest the question of legislative power in this regard. It is argued that, because the school funds are directed to be apportioned in proportion to the numbers of *all* persons between certain ages, therefore *all* such persons must be admitted to the schools. This seems to me a most unwarrantable conclusion. If any principle of constitutional construction can be said to be well settled, it is that the courts cannot declare any limitation of the general powers conferred upon the legislature, except those imposed by the fundamental law, either in express terms or by necessary implication. Had the intention been to compel the education of all, it is but fair to the framers of the instrument we are construing to suppose that language would have been at their command to express that intention. But it is evident that no such idea was in their contemplation. What they were seeking for, they found—namely, a rule of apportionment which would most nearly, in its practical operation, approximate a division of the fund according to the educational necessities of each county. The argument, if it proves anything, proves too much — for, under this construction, no discrimination whatever could be made. The blind, the idiotic, the insane, the vicious and the diseased must all be admitted; and if "may," in the preceding section, is to read "shall," then the whole school law is void, because it fails to accord to the Shoshone infants their constitutional privilege of compulsory education.

The cases cited from Massachusetts and Michigan are wide of the mark. In that from 5 Cushing, the question presented is thus stated by Chief Justice Shaw: " Conceding, therefore, in the full-

est manner, that colored persons, the descendants of Africans, are entitled by law in this commonwealth to equal rights, constitutional and political, civil and social, the question then arises whether the regulation in question, which provides separate schools for colored children, is a violation of any of these rights." In answering this question, he says: "It is urged that this maintenance of separate schools tends to deepen and perpetuate the odious distinction of caste, founded in a deep-rooted prejudice in public opinion. This prejudice, if it exists, *is not created by law*, and probably cannot be changed by law. Whether this distinction and prejudice, existing in the opinions and feelings of the community, would not be as effectually fostered by compelling colored and white children to associate together in the same schools, may well be doubted; at all events, it is a fair and proper question for the committee to consider and decide upon, having in view the best interests of both classes of children placed under their superintendence; and we cannot say that their decision upon it is not founded on just grounds of reason and experience, and in the results of a discriminating and honest judgment. The increased distance to which the plaintiff was obliged to go to school from her father's house, is not such, in our opinion, as to render the regulation in question unreasonable, still less illegal." The case from 18 Mich. was decided in obedience to a statute expressly providing that all residents of any district should have an equal right to attend any school therein.

The next question is, whether this is a special law. This term is used in the constitutions of many of our sister states, and their courts are generally, if not universally, in accord as to its meaning. In a late Iowa case, the court say: "A law applying to all railroad corporations is just as general and uniform as it would be if it applied to all common carriers. Very many laws, the constitutionality of which is not doubted, do not operate alike upon all citizens of the state. These laws are general and uniform, not because they operate upon every person in the state, for they do not; but because every person who is brought within the relations and circumstances provided for is affected by the law. They are general and uniform in their operation upon all persons in the like situation; and the fact of their being general and uniform is not affected by the number of

persons within their scope and operation.    20 Iowa, 343; vide 28 Ib. 374; 27 Ind. 95; 14 Barb. 563.

In Maryland, it is held that all that is required  to make a statute general, as distinguished from special, is that it shall apply to all persons within the  territorial limits described in the act; that the object of the constitution, in prohibiting special  as distinguished from local legislation, was to prevent the abuses that occurred in the great multiplicity of laws passed for particular and individual cases, and not to prevent legislation to meet the wants of communities less extensive in their territorial limits than the state. 29 Md. 521; vide 58 E. C. L. Rep. 620.    According to these authorities, the statute in question is clearly a general law, and I do not understand Judge Lewis as dissenting from the principles they enunciate.    But he contends for an additional element in the definition of a general law, the existence of which, it seems to me, may be conceded for the sake of  the argument, without prejudice to the conclusion that this statute falls strictly within that definition. It is not denied that the legislature may classify persons by sex, age, occupation, residence, or the like, but it is said that it cannot make or adopt novel and  arbitrary classifications; that all persons are to be deemed in the  like situation, between whom there exists neither a substantial distinction, nor a distinction which has been customarily recognized, or which precedent has sanctioned as warranting this sort of discriminating legislation.    It is then assumed that the only difference between a negro  child and a white child lies in the color of  the skin; and on this assumption it is argued that this statute introduces a classification entirely novel and arbitrary.    The fallacy of the argument is patent.    It singles out the most trivial and unimportant of the marks of distinction between the two races.    The other and vital ones—those the existence of which alone induced the legislature to enact this section of the statute—are ignored.    I find them well stated by an eminent judge, in an opinion written about the time this statute was passed, and which affirms the right of a public carrier to separate his passengers by the characteristic of color.    He says:  "The right to separate being clear in proper cases, and it being the subject of sound regulation, the question remaining to be considered is,

whether there is such a difference between the white and black races within this state, resulting from nature, law and custom, as makes it a reasonable ground of separation.  The question is one of difference, not of superiority or inferiority.  Why the Creator made one black and the other white, we know not; but the fact is apparent, and the races distinct, each producing its own kind; and following the peculiar law of its constitution.  Conceding equality, with natures as perfect and rights as sacred, yet God has made them dissimilar; with those natural instincts and feelings which He always imparts to His creatures when He intends that they shall not overstep the natural boundaries He has assigned to them.  The natural law which forbids their intermarriage, and that social amalgamation which leads to a corruption of races, is as clearly divine as that which imparted to them different natures.  The tendency of intimate social intermixture is to amalgamation, contrary to the law of races.  The separation of the white and black races upon the surface of the globe is a fact equally apparent.  Why this is so, it is not necessary to speculate; but the fact of a distribution of men by race and color is as visible in the providential arrangement of the earth as that of heat and cold.  The natural separation of the races is, therefore, an undeniable fact, and all social organizations which lead to their amalgamation are repugnant to the law of nature.  From social amalgamation it is but a step to illicit intercourse, and but another to intermarriage.  The right of these widely separated races to be free from social contact is as clear as to be free from intermarriage.    *    *    *    Law and custom having sanctioned a separation of races, it is not the province of the judiciary to legislate it away.  We cannot say there was no difference in fact, when the law and the voice of the people have said there was.  The laws of the state are found in its constitution, statutes, institutions and general customs.  It is to these sources judges must resort to discover them.  If they abandon these guides they pronounce their own opinions, not the laws of those whose officers they are.  Following these guides, we are compelled to declare that, at the time of the alleged injury, there was that natural, legal and customary difference between the white and black races in this state which made their separation as passengers in a public

conveyance the subject of a sound regulation to secure order, promote comfort, preserve the peace and maintain the rights of both carriers and passengers." 55 Penn. 213.

I understand Judge Lewis to admit that the legislature can exclude all females; such a statute would not be special, according to his definition. Yet it certainly cannot be maintained that, so far as the right to an education is concerned, there is any more substantial difference between a white boy and a white girl, than between a white and a negro child. It is said that the one is a customary and the other a novel classification. But is this so? At the time this statute was enacted, and when our constitution was adopted, the negro was not a voter; he could not hold office; he could not testify in a civil case where a white was a party; and the intermarriage of the two races was unlawful, and the solemnization of such a marriage a misdemeanor. In the language of Judge Agnew: "Under the constitution and the laws, the races stood in a separate relation to each other. The same difference is found in the institutions and customs of the state. There had been no intermixture, socially, religiously, civilly, or politically."

So far from being a novel classification, it was not only known to and recognised by our own constitution, statutes and customs, but was almost universally made the basis of legislation throughout the United States. In Indiana, for instance, under a similar constitutional inhibition of special legislation, negroes were long prohibited from testifying, by a statute the constitutionality of which was never assailed. It is admitted that we cannot disregard the classifications of our own constitution, and it cannot be denied that there is no one of them more prominent than that which gives to the white the privilege of voting and holding office, and denies the same privilege to the negro. Hence it inevitably follows that, when this statute was approved, it was a valid and constitutional law. How, then, has it become void? Not, it is conceded, because it is now, any more than it was then, repugnant to any provision of the laws or constitution of the United States—not by any amendment of our own. By what other process a statute, constitutional when enacted, can have become unconstitutional, I cannot imagine. Suppose a sixteenth amendment should be adopted, declaring that no

state shall deny to females the right of suffrage: would that render all our statutes which apply to females alone, unconstitutional? No one would contend for such a proposition; yet the argument would be the same as that here used in behalf of the negro. It could be then urged with equal force, that females are citizens; stand, as to citizenship, in the same position as any other class of citizens; that the word "male" is obliterated from our constitution as if it had never existed; that they follow the same pursuits, may be members of the same professions, and are, in fact, no way marked or distinguished as a class, except by physical characteristics, &c. The argument, as applied either to the case before us or the one supposed, virtually asserts the novel doctrine, that a statute once valid can be declared invalid, by the application of the maxim, " *cessante ratione legis, cessat et ipsa lex.*" But the reason has not ceased. The distinguishing characteristics of the races remain the same. Nor has the word " white" been obliterated from our constitution. It remains, and with it is retained the ineligibility to office of all save qualified electors *under that constitution.* This "classification. of our own constitution" is wholly without the scope of any of the amendments relied upon.

It seems to have been assumed throughout, that the statute *excludes* negroes from the public schools; but if the alternative be, either to declare the section void, or to construe it as positively commanding the board of trustees to establish a separate school for the education of negroes, the latter course should be adopted. The rules on this subject are thus expressed by the text writers: " As a conflict between the statute and constitution is not to be implied, it would seem to follow, where the meaning of the constitution is clear, that the court, *if possible,* must give the statute such a construction as will enable it to have effect. This is only saying, in another form of words, that the court must construe the statute in accordance with the legislative intent; since it is always to be presumed the legislature designed the statute to take effect, and not to be a nullity. Where a statute directs the doing of a thing for the sake of justice or the public good, the word "may" is the same as the word "shall." The words shall or may are to be construed as imperative in all cases where a public body or officers have been

24

clothed by statute with power to do an act which concerns the public interest or the rights of third persons; and, in such cases, the execution of the power or the doing of the thing required may be insisted on as a duty, though the phraseology of the statute be permissive merely, and not peremptory." The section in question, as originally enacted in March, 1865, provided that "the board may establish a separate school for the education of negroes, *if deemed advisable by them.*" As amended, and as it now stands, it simply provides that the board may establish such separate school. This omission, *ex industria*, of the language expressly leaving the matter to the discretion of the board, is significant; and, though not in itself conclusive, so strengthens the presumptions of legislative intent suggested by the rules of construction above quoted, as to demonstrate the possibility of construing the statute as imperative. Hence it would follow, that the duty enjoined upon the trustees is to establish a separate school,—not to admit the applicant to that already established; and as the writ can only issue to compel the performance of the duty enjoined, and not to compel the doing of what the law prohibits, it results that, by awarding the writ, this court, to all intents, decides that the legislature is deprived, not only of the power to exclude negroes from the common schools, but also of the power to provide for their education in separate schools; and is compelled, either to give the sanction of law to the intermixture of the two races in the same school, or to deprive both races of all educational advantages whatever: a conclusion which, it seems to me, can only be arrived at by an equal disregard of principle and authority.

I think the mandamus should be denied.