## CORBIN et al. v. COUNTY SCHOOL BOARD OF PULASKI COUNTY, VA., et al.

### Civil Action No. 341.

United States District Court
W. D. Virginia, Roanoke Division.

May 2, 1949.

Hill, Martin & Robinson, Richmond, Va., for plaintiffs.

Crowell, Deeds & Sutherland, Pulaski, Va., for defendants.

BARKSDALE, District Judge.

This is an action for a declaratory judgment and injunctive relief instituted by a number of children of school age, suing by their fathers, mothers or legal guardians as their next friends, and by the fathers, mothers and legal guardians in their own right, against the County School Board of Pulaski County, Virginia, and Frank J. Critzer, Division Superintendent of Schools of Pulaski County, Virginia. All plaintiffs are citizens of the United States and of the State of Virginia, resident and domiciled in Pulaski County, Virginia, the adults being tax-payers, and all are members of the Negro race. Plaintiffs bring this suit in their own behalf, and also on behalf of all other persons similarly situated. The defendant School Board is a body corporate created and existing pursuant to the Constitution and laws of the State of Virginia, and defendant Critzer, Division Superintendent, holds office pursuant to the Constitution and laws of the State of Virginia, as its administrative officer. Defendants are legally charged with the duty of maintaining an efficient system of public schools for Pulaski County, and of establishing such schools as may be necessary to the completeness and efficiency of the school system.

This action is based upon the Fourteenth Amendment to the Constitution of the United States, as implemented by 8 U.S. C.A. §§ 41–43, and 28 U.S.C.A. § 41(14) [now § 1343], and the Constitution and laws of the State of Virginia. Without question, this Court has jurisdiction of the parties and the subject matter.

The pertinent section of the Fourteenth Amendment is as follows:

"Section 1. All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

The most pertinent provisions of the Constitution and laws of the State of Virginia are as follows:

"The general assembly shall establish and maintain an efficient system of public free schools throughout the State." Constitution of Virginia, Section 129.

"Mixed schools prohibited.—White and colored children shall not be taught in the same school." Constitution of Virginia, Section 140.

"White and colored persons.—White and colored persons shall not be taught in the same school, but shall be taught in separate schools, under the same general regulations as to management, usefulness and efficiency." Code of Virginia, Section 680.

The plaintiffs allege that, in certain particulars, the policies, customs, usages and practices of the defendants deny them the equal protection of the laws as guaranteed them by the Fourteenth Amendment. More specifically, plaintiffs allege:

(1) That defendants discriminate against them on account of their race, in failing to provide facilities for the elementary education of Negro children equal to facilities afforded white children;

(2) That defendants discriminate against them on account of their race, in failing to provide transportation to and from school for Negro children equal to such transportation furnished white children;

(3) That defendants discriminate against them on account of their race, in failing to enforce the Compulsory School Attendance Law of the State of Virginia as to Negro children as this law is enforced as to white children; and

(4) That defendants discriminate against them on account of their race, in failing to provide secondary or high school facilities for Negroes equal to the high school facilities provided for white children.

Defendants deny all these allegations, and while they admit the short-comings and inadequacies in the public school system of Pulaski County, they aver that such short-comings and inadequacies exist in the facilities provided for white children and Negro children alike, without discrimination.

It will be observed that Section 140 of the Constitution and Section 680 of the Code of Virginia require the segregation of the races in public schools. This has always been the practice in Virginia, and so far as I know, no one has ever contended that this constitutional provision and statute contravene the provisions of the Fourteenth Amendment. The Supreme Court of the United States has universally held that segregation of the races in public schools is within the police power of the several states, and does not contravene the Fourteenth Amendment. In passing on this question in, Gong Lum v. Rice, 275 U.S. 78, 85, 48 S.Ct. 91, 93, 72 L.Ed. 172, Mr. Chief Justice Taft, on the question of segregation, speaking for the court, said:

" * * * Were this a new question, it would call for very full argument and consideration; but we think that it is the same question which has been many times decided to be within the constitutional power of the state Legislature to settle without intervention of the federal courts under the federal Constitution. Roberts v. City of Boston, 5 Cush., Mass., 198, 206, 208, 209; State ex rel. Carnes v. McCann, 21 Ohio St. 198, 210; People ex rel. King v. Gallagher, 93 N.Y. 438, 45 Am.Rep. 232; People ex rel. Cisco v. School Board, 161 N.Y. 598, 56 N.E. 81, 48 A.L.R. 113; Ward v. Flood, 48 Cal. 36, 17 Am.Rep. 405; Wysinger v. Crookshank, 82 Cal. 588, 590, 23 P. 54; Reynolds v. Board of Education, 66 Kan. 672, 72 P. 274; McMillan v. School Committee, 107 N.C. 609, 12 S.E. 330, 10 L.R.A. 823; Cory v. Carter, 48 Ind. 327, 17 Am.Rep. 738; Lehew v. Brummell, 103 Mo. 546, 15 S.W. 765, 11 L.R.A. 828,

23 Am.St.Rep. 895; Dameron v. Bayless, 14 Ariz. 180, 126 P. 273; State ex rel. Stoutmeyer v. Duffy, 7 Nev. 342, 348, 355, 8 Am.Rep. 713; Bertonneau v. Board, 3 Woods, 177, 3 Fed.Cas. page 294, case No. 1,361; United States v. Buntin, C.C., 10 F. 730, 735; Wong Him v. Callahan, C.C., 119 F. 381.

"In Plessy v. Ferguson, 163 U.S. 537, 544, 545, 16 S.Ct. 1138, 1140, 41 L.Ed. 256, in upholding the validity under the Fourteenth Amendment of a statute of Louisiana requiring the separation of the white and colored races in railway coaches, a more difficult question than this, this court, speaking of permitted race separation, said:

" 'The most common instance of this is connected with the establishment of separate schools for white and colored children, which has been held to be a valid exercise of the legislative power even by courts of states where the political rights of the colored race have been longest and most earnestly enforced.'

"The case of Roberts v. City of Boston, supra, in which Chief Justice Shaw, of the Supreme Judicial Court of Massachusetts, announced the opinion of that court upholding the separation of colored and white schools under a state constitutional injunction of equal protection, the same as the Fourteenth Amendment, was then referred to, and this court continued:

" 'Similar laws have been enacted by Congress under its general power of legislation over the District of Columbia (Rev. Stat.D.C. §§ 281, 282, 283, 310, 319), as well as by the legislatures of many of the states, and have been generally, if not uniformly, sustained by the courts'—citing many of the cases above named.

"Most of the cases cited arose, it is true, over the establishment of separate schools as between white pupils and black pupils; but we can not think that the question is any different, or that any different result can be reached, assuming the cases above cited to be rightly decided, where the issue is as between white pupils and the pupils of the yellow races. The decision is within the discretion of the state in regulating its public schools, and does not conflict with the Fourteenth Amendment."

Plaintiffs here, while not expressly admitting the constitutionality of segregation, do not attack its validity. They contend that where there is segregation in the public schools, equal facilities must be afforded to each race.

As to this legal principle, there can be no doubt. The State of Virginia has provided for the education of its children at public expense, and specifically provided, Code of Virginia, § 680, that in the separate schools provided for white children and Negro children that they be taught under the same general regulations as to management, usefulness and efficiency. Besides, to discriminate against any person or class on account of race or color, would be directly in contravention of the Fourteenth Amendment. Missouri ex rel. Gaines v. Canada, 305 U.S. 337, 59 S.Ct. 232, 83 L.Ed. 208; Sipuel v. Board of Regents, 332 U.S. 631, 68 S.Ct. 299, 92 L.Ed. 247; Alston v. School Board of City of Norfolk, 4 Cir., 112 F.2d 992; Mills v. Board of Education, D.C., 30 F.Supp. 245; Freeman v. County School Board, D.C.Va., 82 F.Supp. 167. Consequently, the question for determination here is the factual one of whether or not the policies, usages and customs of the defendants actually do discriminate against these plaintiffs and others similarly situated on account of their race or color.

Taking up plaintiffs' contentions seriatim: The first contention is that defendants discriminate against them on account of their race, in failing to provide for them facilities for elementary education equal to facilities afforded white children.

The School Census for 1945, which is the only one appearing in the record, shows that the pupils in Pulaski County between the ages of seven and nineteen, numbered 6,292 of which 5,716 were white and 576 were Negro children. Therefore, 90.85 per centum were white children and 9.15 percentum were Negro children. There are twenty-six elementary schools in Pulaski County, of which twenty-two are devoted to the teaching of white pupils and four are devoted to the teaching of Negro pupils. The four Negro elementary schools are Calfee Training School in the Town of Pulaski, the William Gresham School at New River,

the Draper School at Draper, and the Rich Hill School at Allisonia. Elementary schools for white pupils are located in the Town of Pulaski and in various other places in the County. The few elementary schools for white pupils located in the towns are reasonably modern and adequate. The Calfee Training School for Negro pupils is also modern and adequate. Having a smaller enrollment, it is not as large as the largest elementary schools for white pupils, but it is the newest permanent school building in the County and is entirely comparable in its facilities to any elementary school in the County. The three other Negro elementary schools are not comparable to the Calfee Training School or the largest of the elementary schools for white pupils, but they do compare favorably with the smaller elementary schools for white pupils in the County. The inadequacy of many of the elementary schools for white children is shocking. Very few have modern plumbing; some do not even have their own water supply. In some instances, white children are temporarily being taught in basements of churches and in temporary tar-paper buildings.

I find no evidence of discrimination against Negro children on account of their race, in the matter of elementary education in Pulaski County.

Plaintiffs' second contention is that defendants discriminate against them on account of their race, in failing to provide them transportation to and from school equal to transportation furnished white children.

For transportation of school children, Pulaski County owns and operates twenty-six buses, and has contracts with four private individuals for the transportation of pupils. Of these county-owned-and-operated buses, three are devoted to the transportation of Negro children. While none of the county-owned buses are new, the buses used for the transportation of Negro children are as good as any and as well equipped. All are equipped with heaters. While the buses for Negro children are heavily loaded, they are not overcrowded to the extent that many of the buses used for white children are. For instance, Bus No. 5, which transports Negro High School students, has a capacity of sixty and carries fifty-nine; Bus No. 23 has a capacity of forty-eight and carries thirty-nine Negro pupils, while Bus No. 1 for white elementary pupils has a capacity of eighty and transports one hundred and fifteen passengers, Bus No. 2 for white elementary pupils has a capacity of seventy-four passengers and transports ninety-eight, Bus No. 15, with a capacity of sixty, transports eighty white children, and Bus No. 24, with a capacity of forty-eight, transports sixty-one white children to and from Draper High School.

I find no evidence of discrimination against Negro children in the matter of transportation to and from school.

Plaintiffs third contention is that defendants discriminate against them on account of their race, in failing to enforce the Virginia Compulsory School Attendance Law as to Negro children as this law is enforced as to white children.

There is evidence that there are a few Negro children of school age in Pulaski County who are not required to attend school because no school facilities are afforded them. On the other hand, it appears that there are at least ten white children of school age who are not required to attend school because no school facilities are afforded them. As to both these Negro children and the white children, they are isolated instances, and I find no evidence of any custom or practice of discrimination in the enforcement of the Virginia Compulsory School Attendance Law.

The plaintiffs' fourth and final contention is that defendants discriminate against them on account of their race, in failing to provide high school facilities for Negroes equal to the high school facilities provided for white children.

I find that prior to 1939, Pulaski County provided no facilities for high school education for its Negro population. In 1939 or 1940, the County began to send its Negro high school students to the Christiansburg Industrial Institute, a High School for Negroes owned by the Friends Freedmen's Association of Philadelphia and operated as a high school by Montgomery County,

which is contiguous to Pulaski. The Pulaski County School Board paid to the Montgomery County School Board tuition for these pupils. During the Summer of 1947, the Friends Freedmen's Association, by deed, conveyed the Christiansburg Industrial Institute, including the 167.5 acres of land upon which the school and other buildings were situate, "as a going accredited high school for day and boarding students for the education of the colored race", to the School Boards of the Counties of Montgomery and Pulaski and the City of Radford, to be operated as a joint high school, as authorized under the laws of the State of Virginia and regulations of the Virginia State Board of Education.

A Virginia statute, Code, Section 670 as amended, Acts of Assembly 1948, p. 1015, in part provides as follows:

"The school boards of counties or of counties and cities, * * * may, with the consent of the State Board of Education, establish joint schools for the use of such counties or of such counties and cities, * * * and may purchase, take, hold, lease, convey and condemn, jointly, property, both real and personal, for such joint schools. * * * The title of all such property acquired for such purposes shall vest jointly in such school boards of the counties or counties and cities in such respective proportions as such school boards may determine, and such schools shall be managed and controlled by the boards jointly, in accordance with such rules and regulations as are promulgated by the State Board of Education. * * *"

Pursuant to this statute, the State Board of Education has promulgated regulations providing for the management and control of jointly owned schools by a joint committee for control. Beginning with the school year 1947-1948, as provided by the above quoted statute and the regulations of the State Board of Education above referred to, the Christiansburg Industrial Institute has been operated as a public free high school for the Negro high school pupils of Pulaski and Montgomery counties and the City of Radford, and for Negro high school pupils from elsewhere who desire to attend the school and pay tuition. The school is managed and controlled by a committee of control of nine members, consisting of two members of the school boards of the two counties and city, and the three division superintendents.

This school is actually in Cambria, a town contiguous to the Town of Christiansburg. Enrollment for the current year numbers 238, of which number 102 are from Pulaski County, 20 from localities other than Pulaski, Montgomery or Radford, 7 from outside the State of Virginia, the remainder coming from Montgomery and the City of Radford. Pulaski County pupils are transported to and from the school by buses owned and operated by the Pulaski County School Board. Christiansburg is to the east of Pulaski County; and as the Town of Pulaski lies near the western boundary of Pulaski County, the children taken from the Town of Pulaski have the longest journey of any Pulaski children, the distance from the Town of Pulaski to the Christiansburg Industrial Institute being twenty-eight miles.

The record does not disclose how all of the 102 Negro high school pupils are transported to the Christiansburg Industrial Institute. However, it does appear that Bus No. 5 transports 59 high school pupils and Bus No. 23 transports 35 high school pupils to Christiansburg. With Bus No. 5, the driver leaves his home at 7:00 A.M., and collects a number of pupils in the vicinity and proceeds to Calfee Training School in the Town of Pulaski. Most of the children board the bus there around 7:30, and are then transported to Christiansburg almost entirely over U. S. Route 11, one of the principal highways of the State, a distance of twenty-eight miles. The bus arrives at Christiansburg between 8:30 and 8:45. Bus No. 23 picks up its first pupil at 7:28 A.M., proceeds to Dublin, which is eight miles east of the Town of Pulaski, and arrives at Christiansburg at 8:30 A.M., traveling from Dublin to Christiansburg, the greater part of the way on U. S. Highway 11. The return trips are similar.

There are three high schools for white children in Pulaski County, located at Pulaski, Dublin and Draper. Of the four high schools, Pulaski is the largest, having for the school year 1947-1948, 606 pupils with 25 teachers. For the same year, there

were 241 pupils with 11 teachers at Dublin, and 187 pupils with 9 teachers at Draper. At Christiansburg, for the same year, there were 233 pupils with 15 teachers. Elementary classes are also conducted in each of the three high schools for white children, no elementary classes being taught at Christiansburg. For 1947-1948, the per capita cost for instruction at each of the four high schools was as follows: Christiansburg $118.35, Draper $102, Pulaski $98.39, and Dublin $95. The curriculum at each school differs from the others. The broadest offering is at Pulaski, which offers 41 Carnegie units; Christiansburg offers 38, Dublin 30 and Draper 24. At Christiansburg, all the teachers hold college degrees with the exception of the instructor in Barbering, who holds a vocational certificate, as does also the instructor in Beauty Culture. All the other teachers have full collegiate professional certificates. At Pulaski, one of the teachers holds a certificate of lesser degree than collegiate professional; at Draper, there are three teachers who hold lesser certificates than collegiate professional, and at Dublin, there are three teachers who hold certificates of lesser degree than collegiate professional. The Pulaski High School and the Christiansburg Industrial Institute are fully accredited by both the State and Southern Association. Draper High School and Dublin High School are accredited by the State, but are not accredited by the Southern Association. Of the 548 high schools in the State, only about 60 are accredited by both the State and Southern Association.

Generally, the curricula offered at the four high schools are similar, although some courses are offered at one or more which are not offered at any other. Plaintiffs complain that certain courses are offered at one or more of the high schools for white pupils which are not offered at Christiansburg. Generally speaking, these differences are minor, and it is also true that there are two courses, Barbering and Beauty Culture, offered at Christiansburg, which are not offered at any of the other high schools. Although these subjects would hardly be classified as recondite, nevertheless they are popular and doubtless serve a useful purpose. The differences in curricula appear to me to be rather inconsequential and definitely not discriminatory. Some of the courses offered at Pulaski, and not offered either at Christiansburg or at the other two high schools for white pupils, such as Business English, in addition to General English, Foundation Mathematics, in addition to General Mathematics, and Diversified Occupations, would appear to me to be definitely non-essential, and quite possibly a waste of time. Pulaski High School, having more than double the enrollment of any of the other high schools, naturally has the largest building, and in some respects it has the best building, as well as more and better equipment. However, it is woefully overcrowded, which condition does not prevail at Christiansburg. The buildings at both Pulaski and Christiansburg are bigger and better than at the other two high schools.

I have not attempted to compare or evaluate herein every detail mentioned in the evidence, but from all the facts, I find that the Pulaski High School and the Christiansburg Industrial Institute are comparable, the Pulaski High School being slightly the better of the two. Both Pulaski and Christiansburg are definitely better high schools than either Draper or Dublin.

Plaintiffs complain of the distance Negro children are required to travel in order to reach Christiansburg Industrial Institute. Those who travel farthest, do travel farther than the average for white children in the county. However, some white children do travel comparable distances. Two of the buses transporting white children to Draper High School have scheduled trips of more than an hour and a half each way. Also it should be borne in mind that nearly all the travel to and from Christiansburg is over U. S. Route 11, one of the best highways in the State. These pupils are all at least fourteen years of age, and their ages run from fourteen to eighteen years or more. Some white children in Pulaski County travel comparable distances over inferior roads, and in other counties, white children are transported much greater distances. For instance, in Scott County, buses transporting white children average 72 miles per bus per day, in Halifax

County buses transporting both white and colored children average 68 miles a day, in Charlotte County the average travel per bus per day is 60 miles, one bus transporting white children making one round trip per day of 78 miles.

The following seems to be pertinent and interesting:

"In order that there be no discrimination, separate schools provided for the education of white and colored children must be of equal equipment and efficiency, and there must also be equality in the length of the school term. However, the mere fact that certain colored children must travel farther to reach a colored school than any white child in the district is required to travel, or travel farther than if they attended a school for white children, while an inconvenience, is not necessarily a deprivation of equal advantages or protection, since this is an incident to any classification, although the rule would be otherwise in case of a school for colored children located where access to it is so difficult and dangerous that children ought not to be required to attend it." 10 American Jurisprudence 906.

■ I find that there is no discrimination against plaintiffs on account of their race, in the matter of high school facilities afforded them.

As to the high school situation, plaintiffs seem principally to rely on their contention that, as a matter of law, Pulaski County is required to provide high school facilities for its Negro children within the geographical boundaries of the County, and rely upon Missouri ex rel. Gaines v. Canada, supra, and Sipuel v. Board of Regents, supra. I cannot agree with this contention. These two cases hold, as does Pearson v. Murray, 169 Md. 478, 182 A. 590, 103 A.L.R. 708, that where a state provides an educational facility for white persons within its boundaries and provides no such facility for colored persons, an illegal discrimination exists which cannot be excused by the state's willingness to pay the tuition of colored persons at some other similar institution outside the state. I think it would be a non sequitur to say that these holdings support plaintiffs' contention in this regard. The Fourteenth Amendment is directed at state action. The State of Virginia, by statute and regulation, has provided for consolidated schools to serve more than one political subdivision of the State. Such schools have been established for both white and Negro pupils. The matter of providing education for its children is a state function, and I can see no legal or common sense reason why this State may not establish and maintain within the State consolidated schools to serve more than one political subdivision of the State. This view seems to me to be supported by the pronouncement of the Supreme Court of the United States in Cumming v. Board of Education, 175 U.S. 528, 545, 20 S.Ct. 197, 44 L.Ed. 262, quoted with approval by Chief Justice Taft in Gong Lum v. Rice, supra, 275 U.S. at page 85, 48 S.Ct. at page 93, 72 L.Ed. 172, as follows:

"Under the circumstances disclosed, we cannot say that this action of the state court was, within the meaning of the Fourteenth Amendment, a denial by the state to the plaintiffs and to those associated with them of the equal protection of the laws, or of any privileges belonging to them as citizens of the United States. We may add that, while all admit that the benefits and burdens of public taxation must be shared by citizens without discrimination against any class on account of their race, *the education of the people in schools maintained by state taxation is a matter belonging to the respective states, and any interference on the part of federal authority with the management of such schools can not be justified, except in the case of a clear and unmistakable disregard of rights secured by the supreme law of the land.*" (Italics supplied)

Public free schools cannot be brought to every man's door; they must be located where they will do the greatest good for the greatest number. Larger schools are able to provide broader offerings, and usually, a better quality of instruction. Consolidation is the modern trend, in order to obtain the benefits inherent in the larger schools. But no two schools are ever precisely equal. Teachers with the same education and training vary in their ability to instruct. The distances pupils are required

to travel to and from school, of necessity, must vary. Some differentiation or discrimination in the enjoyment of public school facilities is inevitable, and the patron who is perfectly satisfied is rather unusual.

It cannot be denied that Negro high school students of Pulaski County are offered a high grade of education at the Christiansburg Industrial Institute. This is demonstrated by the fact that this institution is one of the sixty, out of 548 Virginia high schools, which are fully accredited by the Southern Association. Also it seems significant that 27 pupils from a distance board and pay tuition at the school, four coming from New York, two from New Jersey and one from Washington, D. C. What would be the result of a decree requiring the Pulaski School Board to provide high school education for its Negro pupils within the geographical limits of the County? Although not material to the issue, it is nevertheless a fact that, in all likelihood, the first result would be the destruction of the Christiansburg Industrial Institute, as the remaining enrollment of less than 150 would not justify its continuance at its present high level of efficiency. If the School Board of Pulaski County were required to construct a new high school for Negroes within the County, it would most likely be located in the Town of Pulaski, which would seem to be the center of population of the County. It would start with an enrollment of 102, assuming that all those now attending Christiansburg Industrial Institute enrolled there. No doubt, its enrollment would increase, but a glance at the map of Pulaski County shows that many of its thickly populated sections are nearly as far from the Town of Pulaski as the Town of Pulaski is from Christiansburg. If it should be declared to be the law that each County must provide high school facilities within the geographical limits of the County, it would be the death knell of consolidated high schools for two or more counties or cities, notwithstanding the fact that those who should know seem to be unanimous in their belief that such consolidation is highly desirable. I do not believe that Negro high school pupils of Pulaski County would be benefited by requiring the County School Board of Pulaski County to comply with a decree such as is sought by the plaintiffs. I believe that I would render a disservice to the cause of Negro education by entering such a decree. I do not find the conditions existing in Pulaski County to be the same or similar to the conditions existing in some of the Eastern counties of Virginia, as described by Judge Hutcheson in his opinion in Freeman v. County School Board, supra.

On the whole case, I find that no discrimination against these plaintiffs, or others similarly situated, on account of their race, exists; and it is my conclusion that this action must be dismissed at the costs of the plaintiffs. An order will be entered accordingly. Since my findings of fact and conclusions of law fully appear in this memorandum of decision, no further findings of fact or conclusions of law will be filed.