STATE *v.* CORBETT.

Opinion delivered Nov. 2, 1895.

STATUTES—PASSAGE—YEA AND NAY VOTE.—The constitutional provision that "no bill shall become a law unless, on its final passage, the vote be taken by yeas and nays; the names of the persons voting for and against the same be entered on the journal; and a majority of each house be recorded thereon as voting in its favor" (Const. 1874, art. 5, sec. 25), is not violated where one branch of the legislature, after regularly passing a bill with certain amendments, subsequently recedes from one of their amendments, without taking a vote thereon by yeas and nays.

STATUTES—VALIDITY OF AMENDATORY ACT.—If section 2, of the act of March 31, 1891, grading the offense and fixing the punishment for prize fighting, were invalid (it being conceded that section 1, of such act, creating the offense, was valid), the act of April 13, 1893, amending the former act is not invalid, though its title states that it is an act to amend section 2, of the former act, and not the entire act.

Certiorari to Garland Chancery Court.

*Leland Leatherman*, Chancellor.

## STATEMENT BY THE COURT.

On the 17th October, 1895, C. V. Teague, prosecuting attorney for the seventh judicial circuit, made and filed his affidavit before W. A. Kirk, one of the justices of the peace within and for Garland county, in substance alleging and charging that one James J. Corbett, in said county, had threatened to engage in a prize fight or glove contest with one Robert Fitzsimmons, and that said Corbett threatens and is about to commit an assault and battery upon the person of said Fitzsimmons, the same being of a character calculated to endanger human life. Therefore, he prayed a warrant of arrest to be issued for said Corbett, that he might be dealt with according to law. The warrant was issued, and the sheriff proceeded to execute the same, and arrested Corbett, and produced him before said justice of the peace.

At this stage of the proceedings, the sheriff received a writ from the Hon. Leland Leatherman to produce said Corbett before the chancery court of the third district, over which he presided, at 1:30 o'clock in the afternoon of that day, and this was accordingly done.

The petition for the writ of habeas corpus was demurred to by the respondent sheriff, setting up the facts aforesaid.

Upon hearing the petition, demurrer and response thereto, and testimony adduced in the case, the chancellor discharged the petitioner, holding sections 1842-3 of Sandels & Hill's Digest to be void, by reason of the failure of the legislature to observe constitutional requirements in the passage of the second section of the original act of 31st March, 1891, of which the sections of the digest are amendatory; and, further, that the testimony showed that the contest or fight contemplated by Corbett with Fitzsimmons was not such as necessarily to endanger life, and so forth.

The attorney general, on behalf of the state, sued out from this court the writ of certiorari, to have the proceedings before said chancellor brought to this court for review and proper judgment and order. All formalities were waived, and the cause heard at once.

*E. B. Kinsworthy*, Attorney General, and *Rose, Hemingway & Rose*, for petitioner.

1. If the warrant of the justice showed that Corbett was held to answer a charge, preferred by affidavit, that he was about to commit an offense against the person or property of another, or to commit violence endangering human life, then he was lawfully in custody (Sand. & H. Dig. secs. 2380 *et seq.*); and when the sheriff's return showed that Corbett was so held, the chancery court should have remanded him, without inquiring into the truth or justice of the charge preferred. The judgment that he be discharged was not only not warranted, but was prohibited by statute. Sand. & H. Dig. secs. 3676, *et seq.*

2. The warrant showed that Corbett was held upon an affidavit charging that he was about to commit an offense against the person or property of another by fighting a prize fight that endangered human life. The facts charged would constitute an offense, (*a*) under the law of 1891 prohibiting prize fighting, (*b*) under the law punishing assault and battery.

(*a.*) The act of 1891, prohibiting prize-fighting, was constitutionally passed. There is no question that it passed the senate regularly. The point made is that it was amended in the house so as to make prize-fighting a misdemeanor, and that, when it subsequently passed the house as it came from the senate, the ayes and noes were not called and recorded. This was not required by the constitution. The ayes and noes were recorded when it passed the house with the amendment, and when

the house receded from its amendment, it was not neces-
sary that they be again recorded. In 40 Ark. 200, a
question arose where the legislative journals showed a
similar state of facts, and Judge Smith said: "*The court
would presume that the house receded from its amend-
ments.*" *Idem*, p. 214. A similar construction of a
similar provision is found in 8 N. Y. 317.

But if it be conceded that the second section of the
act of 1891 was not properly passed, and is therefore
void, the first section, having been properly passed, is
valid. The first section contains a complete definition
of the crime, and this was the primary and controlling
purpose of the legislature; the second section only pre-
scribes the punishment, and was obviously of secondary
consideration. The first can stand without the second,
and there is no reason to suppose that its passage was
at all dependent upon the passage of the second. But
when part of an act is valid, it will stand, though other
parts be invalid, whether such invalidity arise from the
subject-matter of the provision, or the manner of its
passage. Cooley's Con. Lim. p. 209; 24 Neb. 586; 24
Fla. 293. We then have a statute defining a crime, but
fixing no punishment. The code of criminal procedure
provides for such cases, and makes the act complete.
Sand. &. H. Dig., secs. 2293, 2294.

(*b*) But if the act of 1893 were wholly void, the
affidavit and warrant show a proper case to bind Corbett
to keep the peace, on the ground that he was about to
commit a battery upon Fitzsimmons, endangering his
life. It is said that prize-fighting does not endanger
life. But the affidavit alleges that it would. Besides,
the common knowledge of the world is that it does, and
this court knows whatever is a matter of common knowl-
edge. Upon such an issue of fact, the supreme court of
Louisiana refused to be deceived. 17 So. Rep. 519.
And if this court should go back of the allegation in the

affidavit to inquire into the facts, it will be satisfied by the circumstances that the allegation is true. It is not bound to accept the opposite conclusion, merely because witnesses swear to it whom the court does not really believe.

*Greaves & Martin* and *G. W. Murphy*, for respondent.

30 S. W. 426 does not apply. In that case the court held that when the journals were silent it might be presumed that the bill was properly enrolled and signed by the governor, in the absence of proof to the contrary. Art. 5, sec. 22 provides that "no bill shall become a law unless, on its final passage, the vote be taken by yeas and nays ; the names of the persons voting for and against the same be *entered on the journal;* and a majority vote of each house be *recorded* as voting in its favor." This is *mandatory*, and no presumption can be indulged in. Cooley, Const. Lim. 135, 136 ; Story on Const. p. 590, 591 ; 27 Ark. 279 ; 33 Ark. 17 ; 31 S. W. 924. All laws passed under rules not conforming with the constitution are void. See also the opinion of the chancellor and authorities cited.

Validity of passage of statute.

BUNN, C. J., (after stating the facts.) The principal question in this case arises from the contention of the appellee, and the decision of the chancellor, that the statute digested as sections 1842 and 1843, and commonly known as the "Anti-Prize-Fighting Law," is invalid. The argument by which it has been sought to be shown to be invalid is this : The original act entitled "An act to punish and prevent prize fighting in Arkansas" approved March 31, 1891, was invalid as to its second section ; and that renders the corresponding section of the act of April 13, 1893, also invalid, the latter being but an amendment of the former; and, if the former be invalid, the latter cannot be valid, since there was

nothing to amend to, when the amendment was made in 1893.

The history of the act may be briefly stated as follows: During the session of the general assembly in 1891, a bill was introduced and passed in the senate, entitled a bill for an "Act to punish and prevent prize-fighting in the state of Arkansas." It contained but two sections,—one, the declaratory section, denouncing prize-fighting with or ,without gloves as an offense; and the other simply fixing the grade of the crime as a felony, and the punishment accordingly. The bill thus went to the house of representatives, and was there regularly amended and passed, the yeas and nays being called and entered in the journal as amended, and returned in that shape to the senate. The amendments by the house were three in number. Only one of them (the second) it is necessary to notice particularly. The second amendment changed the grade of the offense, as fixed in the original bill, so as to make it a misdemeanor, instead of a felony, and fixed the punishment accordingly different, that is, by fine and imprisonment in the county jail. When the senate received back for its consideration the bill as amended, it declined to concur in any of the three amendments adopted by the house, and requested the appointment of a committee of conference, appointing and naming at the same time its members of such committee, and the matter was then referred again to the house, which acceded to the request of the senate, and named the members of the conference committee to act on its part; and so the matter was by both houses referred to this conference committee, which some time afterwards reported to the two houses unanimously recommending that the senate adopt amendments numbers 1 and 3 of the house, and that the house recede from number 2. This report was re-

ceived and adopted in the house, and presumably in the senate, as no question is raised as to its disposition there.

The constitutional provision which, it is contended by the petitioner, was not observed in the recession of the house from its amendment number 2, is section 22, article 5 of the constitution, and is as follows, to-wit : "Every bill shall be read at length, on three different days, in each house, unless the rules be suspended by two-thirds of the house, when the same may be read a second or third time on the same day; and no bill shall become a law unless, on its final passage, the vote be taken by yeas and nays; the names of the persons voting for and against the same be entered on the journal; and a majority of each house be recorded thereon as voting in its favor." The only objection seriously made to this procedure is that, in its recession from the second amendment, the house did not vote by yeas and nays, as required to be done on the final passage of every bill.

Adhering to the doctrine laid down by this court, notably in *Vinsant* v. *Knox*, 27 Ark. 279 and *Smithee*, v. *Garth*, 33 Ark. 17, we hold that the provision of the constitution referred to is mandatory, and we would emphasize the doctrine with all the force that language can give. This, as we understand it, is all that the petitioner contends for, and all that the chancellor found necessary for a basis for his opinion.

But, while the provision is thus mandatory, it must be confined in its application to cases and phases of cases plainly within the scope of its meaning. It is not expected, nor desired, that a constitution should enter into details, or to provide for every contingency and exigency that may arise in the course and progress of legislation. A fundamental law must, of necessity, be more or less a general law, and, in construing any of its provisions, we are never to lose sight of the

manifest object of the same, whether that be in the shape of a permission or prohibition. Although learned jurists, authors, statesmen, politicians and courts have attributed to like provisions almost countless objects, yet the common meaning of it is that it is a precaution against mistake in the number of votes for and against the bill, and, secondarily, that it places a personal responsibility on each voter in the body, so that his constituency may know how he voted on the particular measure.

If, in the details of legislation, it becomes impossible, or even inconvenient, to rigidly adhere to the letter, and yet accomplish the desired end, by acting in the spirit of the constitution, the latter is preferable, because, while the letter killeth, the spirit maketh alive.

Narrowed down, the question is, is the disposition of *amendments*, either by vote of adoption, rejection or recession, a voting on the final passage of the bill? And, to reduce it down to the last analysis, is the vote on the appointment of a conference committee, or on the adoption of its report, a vote on the final passage of the bill? The more important of these two votes is the one agreeing to the appointment of the committee, for a conference committee is a sort of legalized arbitrator to whom is committed the function of settling differences between the two houses, each house, by its vote appointing the committee, agreeing that the legislation forming the subject-matter of the bill is of more importance than adherence to any differences ; and, when this committee can agree and recommend a course of action, it is practically adopted as a matter of course. There is no question as to the majority vote, nor as to how anyone may have voted, for all are voting now on the propriety of yielding something, rather than needful legislation should fail. These instances of voting are generally

held as not coming within the constitutional provision on the subject of voting on the final passage of bills.

To illustrate this point, we will take the case of *Hull* v. *Miller*, 4 Neb. 503, referred to by counsel, wherein a similar constitutional provision was construed. The supreme court of Nebraska in that case said: "It is disclosed that the bill for the act in question originated in the senate, where it was passed by the constitutional majority, the yeas and nays being duly called, and entered on the journal. In the house, the bill was amended, and then duly passed. Upon its return to the senate, all that the journal discloses with respect to it is that the amendments of the house were adopted, but by what majority, or in what manner the vote was taken, the journal of the senate is silent. It is contended by counsel for the plaintiff in error, that the constitution requires the observance of the same formality in the vote by which the amendments of the house were concurred in, as was required on the final passage of the bill before it left the senate, and that the journal of that body should show an observance of this requirement. As to the final passage of the bill, in either house, the position of counsel is clearly correct. Section 11, article 2, of the constitution of 1867, declares that 'On the passage of every bill in either house, the vote shall be taken by yeas and nays, and entered on the journal; and no law shall be passed in either house without the concurrence of a majority of all the members elected thereto.' This provision is most clearly mandatory, and its non-observance in the passage of any bill would render the act absolutely void." * * * But it will be observed that the provision of the constitution above quoted refers only to the vote on the passage of bills. There are numerous other votes necessary during the progress of a bill to its third reading, to which it has no sort of reference whatever.

These are left to the control of the house, under its usual parliamentary rules." The law was sustained, notwithstanding the concurrence of the senate in the house amendments did not appear to have been obtained by a yea and nay vote.

To the same effect is the decision of *McCulloch* v. *State*, 11 Ind. 424, where the precise question was under consideration.

In the case of *People* v. *Supervisors*, 8 N. Y. 317, also cited in argument, the identical question presented in the case at bar was under consideration in the court of appeals of New York. The constitution of that state, adopted in 1846, and under which the case arose, contained this provision : "No bill shall be passed unless by the assent of a majority of all the members to each branch of the legislature, and the question upon the final passage shall be taken immediately upon its last reading, and the ayes and nays entered on the journal." That case is thus stated and disposed of by that court : "On looking into the senate journal of 1851, it appears that the bill in question originated in that body, and that on its final passage the yeas and nays were taken and entered in the journal, and were 21 to 2. The assembly (the house) returned the bill to the senate with divers amendments. The senate had these amendments under consideration, and proposed certain amendments thereto, and then agreed to the amendments as amended by a vote of 23 to 1, the yeas and nays being taken and entered in the journal. The amendments thus amended were returned by the senate to the house. The latter body non-concurred in the amendments of the senate, and a joint committee of conference was appointed, which recommended that the senate should recede from two of its amendments, and that the house should adopt the residue. This was agreed to by the house by a unanimous vote, eighty-six voting by yeas

and nays, which are entered in their journal. The senate receded from the two amendments as recommended by the joint committee, without a vote by yeas and nays, and without entering the names of those voting in the journal. The omission to call the yeas and nays, on receding from these amendments, and recording the names of those voting, is the only fact objected to as a departure from the constitution.

"I think the requirement of the constitution was fully satisfied by the senate on the final passage of the bill before it was sent to the house, and on the final passage of the amendments. The course and practice of the legislature did not require that the whole bill should be again read on receding from the two amendments recommended to be abandoned by the joint committee of conference. There is nothing in the constitution which requires the yeas and nays to be taken in receding from an amendment which the senate had once adopted by the required vote and in the prescribed form. In point of fact, every part of the law as it stands has received the requisite majority in both houses, the yeas and nays in both were taken on its final passage and entered on the journal. The law, therefore, was passed without violating any of the forms of the constitution.

"Again ; the provision of the constitution requiring the question upon final passage of a bill to be taken immediately upon its last reading, and the yeas and nays to be entered on the journal, is only directory to the legislature."

This last statement, it is contended by counsel for the petitioner, destroys the force of the decision as an authority with us, as we hold the provision to be mandatory, and not directory merely. This contention of counsel is, however, not well founded, for it will be observed that the argument preceding is to the effect that the constitutional provision was not violated, but that all

its required formalities were observed, and, besides, the word "again," as an introductory word in the statement, simply means that, even if what has already been said be not sound and conclusive, the act is good anyway, since the constitutional provision is only directory.

As to the application of the strict mandatory rule regulating the method of voting on the final passage of bills to the methods of dealing with amendments, this court has spoken in no uncertain language.

The case of *Chicot County* v. *Davies*, 40 Ark. 200, presented this state of facts : An original bill, in the house, for an act to authorize county subscriptions for stock in railroads provided that the county court, upon application of the president and directors of the company, *and* one hundred of the voters of the county, should submit the question to a popular vote. The house journal showed that the bill was amended in that body by substituting the word "or" for "and," so as to authorize the county court to submit the question on the application of either the said company officers, *or* of the one hundred voters. The bill passed the house as amended, and was transmitted to the senate, and there passed, and sent to the governor, and by him approved. The enrolled bill, so approved by the governor, however, contained the word "and," as did the original bill, instead of the word "or," as did the bill when amended by the house and sent to the senate. Then arose the contention that the bill enrolled and signed by the governor was not the same bill passed by the house and senate. Certainly it it was not the same as was passed by the house, for the change made by the substitution of "and" for "or" was a marked and radical one. There was no affirmative showing in the journal of the senate that the change had been made by a yea and nay vote, nor in fact was there any showing whatever as to the manner in which the change was made. This court, in effect, held that

the strict mandatory rule did not apply to such a case, saying: "Now the constitution of 1868 (the same as the present constitution as to this subject) did not require amendments to bill to be entered on the journal; consequently, in order to uphold the act, we will presume that the house receded from its amendment substituting "or" for "and." Citing *Blessing* v. *Galveston*, 42 Tex. 641; *Miller* v. *State*, 3 Ohio St. 475; *McCulloch* v. *State*, 11 Ind. 424; *Supervisors* v. *People*, 25 Ill. 182; *Commissioners* v. *Higginbotham*, 17 Kas. 62. In that case there was an entire absence of recitals in the journal as to any vote being taken upon the recession by the house. In the case at bar there is a recital, in effect, that the vote on the recession was had, but a failure to state how, although inferentially we conclude that it was taken in the usual method of adopting agreements made by conference committees. This makes little difference, for the contention is that the journal should affirmatively show a vote by yeas and nays, and the names of those voting for and against to be entered in the journal. This showing was not made. The court's ruling was that it was not necessary, for it might be presumed that the house did not really recede from its amendment. The principle of that case is not materially different from the one involved in this case, so far as we are able to see.

Section 12, article 5 of the constitution provides that "each house shall have the power to determine the rules of its proceedings." Now, just at what point the strict mandatory rule of section 22, same article, may cease to be applicable in any given case, for reasons of systematic and convenient procedure, and at what point the parliamentary rules each house is empowered to make, by constitutional provision, may begin to be applied, is often a question of much difficulty of solution; and something doubtless may be properly left to the

wisdom and sound discretion of the law-making depart-
ment, to determine such a question as it may arise in
each case.   We are favored with no proof on the sub-
ject, but according to common knowledge and the au-
thorities, these parliamentary rules seem to have much
to do with the procedure through committees.

After all, the proposition before us is not that there
is doubt as to the validity of the section of the statute
thus called in question, but rather that the same is void
beyond a reasonable doubt, for we are now proceeding
under the familiar, yet none the less rigid and inflexible,
rule that all doubts must be resolved in favor of the
legislative action.   Entertaining the views above ex-
pressed, we are unwilling to say the section is invalid.

There is another theory upon which the validity of
the statute should be maintained.   The first or declar-
atory section of the original act of 1891 was admitted
to be valid.   Admitting, then, for the sake of argument,
that the second section, or the section grading the
offence and fixing the punishment, was void as con-
tended, the question arises, how does that affect the
whole act of 1893?

*Validity of amendatory act.*

The declaratory part of the original act, or that
part denouncing certain acts as a crime, truly expresses
the legislative will in so far.   Now, in anticipation that,
peradventure, at some time some bill might be passed,
in which by oversight, neglect or ignorance, no punish-
ment was fixed for the crime, the legislature at the out-
set enacted that, when just such a state of things
should at any time exist, then rather than that legis-
lation should fail altogether of its purpose, the punish-
ment should be as at common law, with certain limita-
tions.   See sections 601, 2293 and 2294 of the digest.
Thus the act was a valid law on the statute books, with
declaratory part undisputed, and punitive or enforcing

part derived from the general statutes, and thus remained until amended in 1893.

When the legislature in 1893 undertook to amend the prize-fighting law, it evidently regarded the act of 1891 as valid in its entirety, and therefore denominated the amendment made then as an amendment of the second section, the one now called in question. This amendment, it is contended, is void for the reason that, the original section being void, there was therefore nothing to amend to. Such is a rule applicable to pleadings in court, but by what authority we are compelled to apply it to the law-making department in enacting laws we are not advised. The rule for the guidance of the courts is to ascertain the intention of the legislature, and not the mistakes of the legislature, either of law or fact. Now, the manifest intention of the legislature was to change the law as it appeared on the statute books by simply making prize-fighting a misdemeanor, instead of a felony, and to change the punishment for a violation of the law accordingly. The amendment, which in fact is a substitution for the original second section, and not an amendment, properly speaking, was properly passed, with all proper reference to the whole act, as matter of identification.

Again, if it be true that the original second section was void, and the rule that an amendment of a void thing is also void should be considered as in any way affecting the legislative action, that still does not extend so far as to make void the amendment. By reference to the amendatory act of 1893, which is now the law on the subject, we see that it is entitled "An act to amend section 2 of 'An act to punish and prevent prize-fighting in the state of Arkansas,' approved March 31st, 1891." If the title had been to amend the act of 1891, instead of the second section, there would have been no objection to the act as amended. We are thus called

upon to declare a law void, because, by mistake, neglect or ignorance, the legislature has identified and named its action by wrong words and inappropriate language; that it has done a vain thing. Sutherland on Statutory Construction, sec. 331.

The rule adopted by all the courts, so far as we know, is: "Any act which manifests a design that any particular provision shall be the law is a sufficient enactment." *Wood* v. *Wood*, 54 Ark. 172; *Postmaster General* v. *Early*, 12 Wheaton, 136; End. Int. of Statutes, secs. 372–76; *State* v. *Miller*, 23 Wis. 634. And when the legislature has power to enact a law, and its intention is manifest, effect will be given to the intention, rather than to a mere failure of its language to express or describe what was intended.

We are of the opinion that the statutes in question are valid laws of the state, and, as the supposed invalidity of those statutes seem to have been the sole ground upon which the proceedings of the chancellor were had, the writ of habeas corpus is quashed, the proceedings thereunder annulled, and the respondent sheriff will proceed to execute his warrant, as the law directs and his duty may require.