WILLIAM REYNOLDS v. THE BOARD OF EDUCATION
OF THE CITY OF TOPEKA.

No. 13,140.   (72 Pac. 274.)

SYLLABUS BY THE COURT.

1. CONSTITUTIONAL LAW — *Separate Schools for White and Colored Children* — *Act of 1879.*   Chapter 81, Laws of 1879 (Gen. Stat. 1901, §§ 6290–6296), providing that boards of education in cities of the first class shall have power to organize and maintain separate schools for the education of white and colored children, except in the high school, is not invalidated by the fact that it purports to amend a former statute which had previously been repealed by implication.

2. ——— *Subject Clearly Expressed in Title.*   The act referred to is not violative of section 16 of article 2 of the constitution, providing that no bill shall contain more than one subject, which shall be clearly expressed in its title.

3. ——— *System is Uniform.*   Such act does not violate section 2 of article 6 of the constitution, providing for the establishing of a uniform system of common schools.

4. ——— *Not Violative of Fourteenth Amendment.*   Such act does not violate the fourteenth amendment to the constitution of the United States, prohibiting any state from denying to any person within its jurisdiction the equal protection of the laws.

Original proceeding in mandamus.   Opinion filed April 11, 1903.   Writ denied.

*G. C. Clemens*, and *F. J. Lynch*, for plaintiff.

*J. W. Gleed, J. L. Hunt*, and *Gleed, Ware & Gleed*, for defendant.

The opinion of the court was delivered by

BURCH, J. : The board of education of the city of Topeka, a city of the first class, provides for the education of colored children in schools separate from those maintained for white children, in all grades below the high school.   The plaintiff, a colored man, a

citizen of the United States, and a resident of the city, presented his son at a school which white children only were allowed to attend, and demanded that he be received and taught there. The child was eligible to instruction at that school, except for his color, and on this account was refused admission, and consigned to a school in the same neighborhood provided for the colored race, and from which white children were excluded. Thereupon this proceeding was brought to compel the board, by writ of mandamus, to admit the colored boy to the white school.

In *Board of Education v. Tinnon*, 26 Kan. 1, and *Knox v. Board of Education*, 45 id. 152, 25 Pac. 616, 11 L. R. A. 830, it was decided that, without clear legislative authority, boards of education in cities of the second class have no power to establish separate schools for the education of white and colored children, and the same express legislative warrant must appear for such action on the part of a board of education of a city of the first class, or it cannot be sustained. Does such a statute exist ?

The question is not free from difficulty. Chapter 18 of the Laws of 1868 is entitled "An act to incorporate cities of the first class." The chapter is divided into six articles relating to various subjects. Article V is devoted to the general topic of the maintenance of schools, and covers all the details of that subject. Section 75 of that article reads as follows :

1. Amendment of repealed statute.

"The board of education shall have power to select their own officers ; make their rules and regulations, subject to the provisions of this act ; to organize and maintain separate schools for the education of white and colored children ; to establish a high school whenever, in their opinion, the educational interests of the city demand the same ; and to exercise the sole con-

trol over the public schools and school property of the city.''

In 1876 the legislature, by an act entitled ''An act for the regulation and support of common schools,'' codified the school laws of the state, and embodied in one comprehensive chapter (No. 122) all matters pertaining to the subject expressed in that title. Article X of this chapter relates to public schools in cities of the first class, and provides that all cities of more than 15,000 inhabitants shall be governed thereby. Section 4 of this article is the counterpart of section 75 of article V, chapter 18, Laws of 1868, and reads as follows:

''The board of education shall have power to select their own officers; to make their rules and regulations, subject to the provisions of this act; to establish a high school, whenever in their opinion the educational interests of the city demand the same; and to exercise the sole control over the public schools and school property of the city.''

It will be observed that the clause of former section 75, authorizing the organization and maintenance of separate schools for the education of white and colored children, is omitted from this section. Since the law of 1876 was intended to be a complete revision of the school laws of the state, the law of 1868 upon that subject was repealed by implication, and with it the authority to establish separate race schools. While many provisions of the former law may be found in the revision, this did not operate to preserve the divisions of the statute containing them. So far as the provisions of the new law are the same as those of the old, they are to be construed as a continuation of such provisions, and not as a new enactment. (Gen. Stat. 1901, § 7342.) But this applies to provisions only,

and not to chapters, articles or sections, as such, which are eliminated by the repeal.

In 1879 a statute was passed (Laws 1879, ch. 81; Gen. Stat. 1901, §§ 6290–6296) with the following title:

"An act to amend an act entitled 'An act to incorporate cities of the first class,' approved February 24, 1868, and to authorize boards of education of cities of the first class to refund certain bonds."

Section 1 of this act reads as follows:

"Section seventy-five of the act entitled 'An act to incorporate cities of the first-class,' approved February twenty-fourth, eighteen hundred and sixty-eight, is hereby amended so that the same shall read and be as follows: Section 75. The board of education shall have power to elect their own officers, make all necessary rules for the government of the schools of said city under its charge and control, and of the said board, subject to the provisions of this act and the laws of this state; to organize and maintain separate schools for the education of white and colored children, except in the high school, where no discrimination shall be made on account of color; to exercise the sole control over the public schools and school property of said city; and shall have the power to establish a high school, and maintain the same in whole or in part, by demanding, collecting and receiving a tuition fee for and from each and every scholar or pupil attending such high school."

Section 2 amends section 76 of the act of 1868, which related to the organization of the board of education, the selection of its officers, and of a superintendent of schools, the date of the termination of the fiscal year, and to official reports to be made to the board. Sections 3, 4, 5, 6 and 7 embody new legislation on the subject of refunding bonds. This statute must furnish authority for the order of the board of education in controversy or none exists.

It is contended that, since the law of 1879 purports to amend a statute already repealed by implication, it is void, and authorities are cited to that effect. (*Blakemore v. Dolan et al.*, 50 Ind. 194; *Hall et al. v. Craig et al.*, 125 id. 523, 529, 25 N. E. 538; *State, ex rel. Seward Co., v. Benton*, 33 Neb. 823, 51 N. W. 140; *L. & N. R. R. Co. v. City of East St. Louis*, 134 Ill. 657, 25 N. E. 962.)

In this state the constitution contemplates that repealed acts may be revived if only the new enactment contain all the revived matter and do not merely make reference to it. (Art. 2, § 16.) The requirement that acts amendatory of sections shall include the entire section or sections amended is designed to prevent amendments by mere reference and amendments by merely inserting or striking out; but there is no constitutional inhibition upon the legislature's adopting a repealed law as the basis of a new enactment, and if it should choose to employ such a method of registering its purpose that fact alone ought not to defeat its will. Statutes are not to be so lightly nullified. Although they were no longer operative as laws, sections 75 and 76 remained upon the records in the office of the secretary of state, and continued to be cognizable from the statute-books in which they had been printed. Their subject-matter continued to be open fields for legislation. It is perfectly manifest that the legislature intended to reenact their provisions with such modifications as were necessary to meet the requirements of the inhabitants of cities of the first class, and intended the law upon those subjects thereafter to be as disclosed by sections 1 and 2 of the act of 1879. This intention must, therefore, be given full effect. There is no doubt that this may be done whenever the amended section retains its place in the

original act.   ( *The State v. Brewster*, 39 Ohio St. 653 ; *Jones v. Commissioner of the State Land Office*, 21 Mich. 236 ; *Basnett v. City of Jacksonville*, 19 Fla. 664 ; *Commonwealth v. Kenneson*, 143 Mass. 418, 9 N. E. 761.) And in other cases where the power of the legislature over the subject-matter exists and its purpose is plain, the last law has been allowed to stand as an independent enactment.

In *People, ex rel. Strough, v. Canvassers*, 143 N. Y. 84, 88, 37 N. E. 649, affirming *People v. Board of County Canvassers*, 28 N. Y. Supp. 871, it was said :

" But this case may rest, for its decision, upon the broad principle that chapter 414 of the Laws of 1883 was a reenactment of the law, as contained in the act of 1856, and, as an independent statute, is unaffected by considerations of whether the provision of law, which it purports to amend has been repealed or not by previous statutes.   It is the duty of the court, when passing upon an act of the legislature, to uphold and give effect to it, where it is possible and when the legislative intent is plain, and there is no room for doubt here as to what the legislature intended.  .  .  . The enactment of this law is put into the form of an amendment of a law which was standing upon the statute-books, and whether that earlier law, by force of subsequent legislation, had become inoperative is wholly immaterial.   The only question is, Has the legislature in the enactment complained of expressed its purpose intelligibly and provided fully upon the subject?   If it has, then its act is valid and must be upheld.   That is the case here.   The act of 1883 contains all that is provided for in the particular section of the act of 1856, and gives full power to the boards of supervisors, with respect to the formation of school commissioners' districts.   A law thus explicit and complete may not be disregarded, or invalidated, because of a possible mistake of the legislature with respect to the existence of the statute, in amendment of which the act is passed.   It is an enactment of a law in any view."

See, also, *State v. Warford*, 84 Ala. 15, 3 South. 311 ; *State v. Corbett*, 61 Ark. 226, 32 S. W. 686 ; *Harper v. State*, 109 Ala. 28, 19 South. 857 ; *Columbia Wire Co. v. Boyce*, 44 C. C. A. 588, 104 Fed. 172. The same principle is recognized inferentially in *Wall v. Garrison*, 11 Colo. 515, 19 Pac. 469.

It is further urged that the act of 1879 cannot stand because the title is insufficient. If the law of 1868 had not been repealed no doubt whatever would exist

2. Title of act sufficient.

that the title sufficiently expresses the subject of the act, and such repeal cannot render that subject any more indefinite. That the act contains but one subject has already been determined by this court. ( *Board of Education v. The State*, 26 Kan. 44.)

Finally, it is said that the law of 1879 was repealed by chapter 37, Laws of 1881, entitled "An act to incorporate and regulate cities of the first class, and to repeal all prior acts relating thereto." While this title expresses a purpose to repeal all prior legislation relating to cities of the first class, the body of the act does not do so, and repeals are not accomplished by titles. The repealing clause refers expressly to a law of 1874, and beyond that repeals nothing except conflicting acts and parts of acts. No reference is made anywhere in the law to schools, and hence the statute of 1879, devoted solely to that subject, is not in conflict with it.

From this it appears that the legislature has expressly empowered the board of education of the city to make the order assailed. Was it competent for the legislature to do this ? The question is solely one of power and not of policy. Whether, in view of the history of this state, the traditions of its people, the composition and quality of its citizenship, its political

Reynolds v. Board of Education.

and social ideals, and the relations of the white and colored people of large cities to each other, such a law is wise or beneficent this court is forbidden to investigate.   It can only declare if the statute comports with the constitutional guaranties established for the protection of the citizen against depredations upon his rights.

Counsel for plaintiff assert that the statute violates section 2 of article 6 of the state constitution, which reads as follows :

"The legislature shall encourage the promotion of intellectual, moral, scientific and agricultural improvement, by establishing a uniform system of common schools, and schools of a higher grade, embracing normal, preparatory, collegiate and university departments."

3. System is uniform.

It is said that the word "uniform" means "the same throughout the state ;" that "common" refers to the people as a whole and means "open to all," and that the establishment of separate schools for white and colored children in cities of the first class only is repugnant to both requirements.   It is perfectly plain, however, that a uniform system of schools means uniform educational facilities.   Such facilities may be maintained with great simplicity of organization in sparsely settled regions, while the most elaborate machinery is necessary to meet the requirements of dense populations in cities.   The system of schools, however, is uniform.   Divisions and classifications of children in various respects may be necessary in the city and not in the country in order to obtain the best results from the facilities afforded.   The facilities themselves, however, remain uniform.   The system of educational opportunities, advantages, methods and accommodations is uniform, constant, and equal, whether availed

of by children in a rural district or a city ward; whether by males or females; whether by blacks and whites commingling, or by them separately; and whether race classification be made in one grade, or department, or city, or county, or in many.

In *Cory et al. v. Carter*, 48 Ind. 327, 358, 17 Am. Rep. 738, one of the questions for determination was if the uniformity of the school system of the state was broken by the establishment of separate schools for colored and for white children. The court said :

"Under our constitution, our common-school system must be general. That is, it must extend over and embrace every portion of the state. It must be uniform. The uniformity required has reference to the mode of government and discipline, the branches of learning taught, and the qualifications as to age and advancement in learning required of pupils as conditions of their admission. It does not mean that all the schools shall be of the same size and grade, or that all the branches of learning taught in one school shall be taught in all other schools, or that the qualifications as to age and advancement, which would admit a pupil in one school, would entitle such pupil to admission into all the other schools. Uniformity will be secured when all the schools of the same grade have the same system of government and discipline, the same branches of learning taught, and the same qualifications for admission."

The word "common" as applied to the system of schools to be established under the constitution clearly refers to grade. A distinction is made between " common schools " and "schools of a higher grade." But if the definition of the plaintiff be adopted the constitution is not violated by the separation of races in the schools. The constitution of Indiana requires that the common schools be "equally open to all." In the decision just referred to the court discussed

the bearing of this provision upon the precise question at issue, as follows :

"This system of common schools must consist of many schools in different localities or geographical divisions ; and these schools may be of different grades. In some of these localities or divisions there may be schoolhouses, and in others none. In some the schoolhouse or houses may not be sufficient to accommodate all, and the revenue may not be sufficient to provide for them.

"In this system, there ought to be and must be a classification of the children.   This classification ought to and will be with reference to some properties or characteristics common to or possessed by a certain number out of the whole ; and these classes may be put into and taught in different parts of the same school, or different rooms in the same schoolhouse, or different schoolhouses, as convenience and good policy may require.

"This is too reasonable to admit of question ; for it concerns the general good, and does not affect the quality of the privilege, but regulates the manner of its enjoyment.

"This being settled, what is there to prevent the classification of children, equally entitled to the privilege of the system of common schools, with reference to difference of race or color, if the judgment of the legislature should hold such a classification to be most promotive of, or conducive to, the good order and discipline of the schools in the system and the interest of the public?   .   .   .

" It being settled that the legislature must provide for the education of the colored children as well as for the white children, we are required to determine whether the legislature may classify such children, by color and race, and provide for their education in separate schools, or whether they must attend the same school without reference to race or color.   In our opinion, the classification of scholars, on the basis of race or color, and their education in separate schools,

involve questions of domestic policy which are within the legislative discretion and control, and do not amount to an exclusion of either class. In other words, the placing of the white children of the state in one class and the negro children of the state in another class, and requiring these classes to be taught separately, provision being made for their education in the same branches, according to age, capacity, or advancement, with capable teachers, and to the extent of their *pro rata* share in the school revenue, does not amount to a denial of equal privileges to either, or conflict with the open character of the system required by the constitution. The system would be equally open to all. The tuition would be free. The privileges of the schools would be denied to none. The white children go to one school, or to certain of the schools in the system of common schools. The colored children go to another school, or to certain others of the schools in the system of the common schools. . . .

"In our opinion, there would be as much lawful reason for complaint, by one scholar in the same school, that he could not occupy the seat of another scholar therein at the same time the latter occupied it, or by scholars in the different classes in the same school, that they were not all put in the same class, or by the scholars in different schools, that they were not all placed in one school, as there is that white and black children are placed in distinct classes and taught separately, or in separate schools."

In a very recent case, decided February 6, 1900, the New York court of appeals reached the same conclusion upon an analogous state of facts :

"Again, it is said that the present constitution requires the legislature to provide for the maintenance and support of a system of free common schools, wherein all the children of this state may be educated, and therefore the school board was required to admit to any school under its control all the children who desired to attend that particular school. Such a con-

struction of the constitution would not only render the school system utterly impracticable, but no such purpose was ever intended.   There is nothing in that provision of the constitution which justifies any such claim.   The most that the constitution requires the legislature to do is to furnish a system of common schools where each and every child may be educated ; not that all must be educated in any one school, but that it shall provide or furnish a school or schools where each and all may have the advantages guaranteed by that instrument.   If the legislature determined that it was wise for one class of pupils to be educated by themselves, there is nothing in the constitution to deprive it of the right to so provide.   It was the facilities for and the advantages of an education that it was required to furnish to all the children, and not that it should provide for them any particular class of associates while such education was being obtained. In this case, there is no claim that the relator's children were excluded from the common schools of the borough, but the claim is that they were excluded from one or more particular schools which they desired to attend, and that they possessed the legal right to attend those schools, although they were given equal accommodations and advantages in another and separate school.   We find nothing in the constitution which deprived the school board of the proper management of the schools in its charge, or from determining where different classes of pupils should be educated, always providing, however, that the accommodations and facilities were equal for all.   Nor is there anything in this provision of the constitution which prevented the legislature from exercising its discretion as to the best method of educating the different classes of children in the state, whether it relates to separate classes, as determined by nationality, color, or ability, so long as it provides for all alike in the character and extent of the education which it furnished and the facilities for its acquirement.'' ( *People, ex rel. Cisco, v. School Board*, 161 N. Y. 598, 56 N. E. 81, 48 L. R A. 115.)

The supreme judicial tribunal of Massachusetts, through the learned Chief Justice Shaw, so long ago as 1849 declared that the principle of equality is nowise violated by the establishment of separate race schools :

" The great principle, advanced by the learned and eloquent advocate of the plaintiff, is, that by the constitution and laws of Massachusetts, all persons without distinction of age or sex, birth or color, origin or condition, are equal before the law. This, as a broad general principle, such as ought to appear in a declaration of rights, is perfectly sound ; it is not only expressed in terms, but pervades and animates the whole spirit of our constitution of free government. But, when this great principle comes to be applied to the actual and various conditions of persons in society, it will not warrant the assertion, that men and women are legally clothed with the same civil and political powers, and that children and adults are legally to have the same functions and be subject to the same treatment ; but only that the rights of all, as they are settled and regulated by law, are equally entitled to the paternal consideration and protection of the law, for their maintenance and security. What those rights are, to which individuals, in the infinite variety of circumstances by which they are surrounded in society, are entitled, must depend on laws adapted to their respective relations and conditions.

"Conceding, therefore, in the fullest manner, that colored persons, the descendants of Africans, are entitled by law, in this commonwealth, to equal rights, constitutional and political, civil and social, the question then arises, whether the regulation in question, which provides separate schools for colored children, is a violation of any of these rights. . . .

"The power of general superintendence vests a plenary authority in the committee to arrange, classify, and distribute pupils, in such a manner as they think best adapted to their general proficiency and welfare. If it is thought expedient to provide for very young

children, it may be, that such schools may be kept exclusively by female teachers, quite adequate to their instruction, and yet whose services may be obtained at a cost much lower than that of more highly qualified male instructors. So if they should judge it expedient to have a grade of schools for children from seven to ten, and another for those from ten to fourteen, it would seem to be within their authority to establish such schools. So to separate male and female pupils into different schools, it has been found necessary, that is to say, highly expedient, at times, to establish special schools for poor and neglected children, who have passed the age of seven, and have become too old to attend the primary school, and yet have not acquired the rudiments of learning, to enable them to enter the ordinary schools. If a class of youth, of one or both sexes, is found in that condition, and it is expedient to organize them into a separate school, to receive the special training, adapted to their condition, it seems to be within the power of the superintending committee to provide for the organization of such special school. . . .

"The committee, apparently upon great deliberation, have come to the conclusion, that the good of both classes of schools will be best promoted, by maintaining the separate primary schools for colored and for white children, and we can perceive no ground to doubt, that this is the honest result of their experience and judgment.

"It is urged, that this maintenance of separate schools tends to deepen and perpetuate the odious distinction of caste, founded in a deep-rooted prejudice in public opinion. This prejudice, if it exists, is not created by law, and probably cannot be changed by law. Whether this distinction and prejudice, existing in the opinion and feelings of the community, would not be as effectually fostered by compelling colored and white children to associate together in the same schools, may well be doubted; at all events, it is a fair and proper question for the committee to consider and decide upon, having in view the best interests of both classes of children placed under their

superintendence, and we cannot say, that their decision upon it is not founded on just grounds of reason and experience, and in the results of a discriminating and honest judgment." (*Roberts v. The City of Boston*, 5 Cush. [Mass.] 198, 206, 208, 209.)

The question of the education of the colored race was considered at length by the convention which framed our constitution, and an examination of its proceedings discloses the fact that it was intended by the founders of the state government to leave the legislature free to solve the problem according to its best judgment and discretion, as changed circumstances and conditions might require. As early as 1862 the power was exercised by the enactment of section 18, article 4, chapter 46, Compiled Laws of 1862, applying to cities of not less than seven thousand inhabitants, which reads as follows :

"The city council of any city under this act shall make provisions for the appropriation of all taxes for school purposes collected from black or mulatto persons, so that the children of such persons shall receive the benefit of all moneys collected by taxation for school purposes from such persons, in schools separate and apart from the schools hereby authorized for the children of white persons."

The course of later legislation has been traced. This is the first time the power of the legislature has been impugned. No express prohibition can be found, and upon both reason and authority the statute in question must be held valid under the state constitution.

But it is said that the fourteenth amendment to the constitution of the United States is violated by the statute in question, in that it deprives colored children of the equal protection of the laws. Counsel for plaintiff cites no authority for this position, and none can be found.

4. Fourteenth amendment not violated.

It has been decided otherwise by many courts. See the collation of cases from the federal and state courts in the American and English Encyclopedia of Law, second edition, volume 6, page 84.

In *The State, ex rel. Garnes, v. McCann et al.*, 21 Ohio St. 198, 210, it was said :

"Conceding that the fourteenth amendment not only provides equal securities for all, but guarantees equality of rights to the citizens of a state, as one of the privileges of citizens of the United States, it remains to be seen whether this privilege has been abridged in the case before us. The law in question surely does not attempt to deprive colored persons of any rights. On the contrary it recognizes their right, under the constitution of the state, to equal common-school advantages, and secures to them their equal proportion of the school fund. It only regulates the mode and manner in which this right shall be enjoyed by all classes of persons. The regulation of this right arises from the necessity of the case. Undoubtedly it should be done in a manner to promote the best interests of all. But this task must, of necessity, be left to the wisdom and discretion of some proper authority. The people have committed it to the general assembly, and the presumption is that it has discharged its duty in accordance with the best interests of all. At all events, the legislative action is conclusive, unless it clearly infringes the provisions of the constitution.

"At most the fourteenth amendment only affords to colored citizens an additional guaranty of equality of rights to that already secured by the constitution of the state.

"The question, therefore, under consideration is the same that has, as we have seen, been heretofore determined in this state, that a classification of the youth of the state for school purposes, upon any basis which does not exclude either class from equal school advantages, is no infringement of the equal rights of citizens secured by the constitution of the state.

"We have seen that the law, in the case before us, works no substantial inequality of school privileges between the children of both classes in the locality of the parties. Under the lawful regulation of equal educational privileges, the children of each class are required to attend the school provided for them, and to which they are assigned by those having the lawful official control of all. The plaintiff, then, cannot claim that his privileges are abridged on the ground of inequality of school advantages for his children. Nor can he dictate where his children shall be instructed, or what teacher shall perform that office, without obtaining privileges not enjoyed by white citizens. Equality of rights does not involve the necessity of educating white and colored persons in the same school, any more than it does that of educating children of both sexes in the same school, or that different grades of scholars must be kept in the same school. Any classification which preserves substantially equal school advantages is not prohibited by either the state or federal constitution, nor would it contravene the provisions of either. There is, then, no ground upon which the plaintiff can claim that his rights under the fourteenth amendment have been infringed."

In *People, ex rel. King, v. Gallagher*, 93 N. Y. 438, 447, 45 Am. Rep. 232, the opinion reads:

"It is believed that this provision will be given its full scope and effect when it is so construed as to secure to all citizens, wherever domiciled, equal protection under the laws and the enjoyment of those privileges which belong as of right to each individual citizen. This right, as affected by the questions in this case, in its fullest sense, is the privilege of obtaining an education under the same advantages and with equal facilities for its acquisition with those enjoyed by any other individual. It is not believed that these provisions were intended to regulate or interfere with the social standing or privileges of the citizen, or to have any other effect than to give to all, with-

out respect to color, age or sex, the same legal rights and the uniform protection of the same laws.   . . .

"When the government, therefore, has secured to each of its citizens equal rights before the law and equal opportunities for improvement and progress, it has accomplished the end for which it is organized and performed all of the functions respecting social advantages with which it is endowed.

"The design of the common-school system of this state is to instruct the citizen, and where for this purpose they have placed within his reach equal means of acquiring an education with other persons, they have discharged their duty to him, and he has received all that he is entitled to ask of the government with respect to such privileges.   The question as to how far he will avail himself of those advantages, or, having done so, the use which he will make of his acquirements, must necessarily be left to the action of the individual.   . . .

"If the right, therefore, of school authorities to discriminate, in the exercise of their discretion, as to the methods of education to be pursued with different classes of pupils be conceded, how can it be argued that they have not the power, in the best interests of education, to cause different races and nationalities, whose requirements are manifestly different, to be educated in separate places.   We cannot see why the establishment of separate institutions for the education and benefit of different races should be held any more to imply the inferiority of one race than that of the other, and no ground for such an implication exists in the act of discrimination itself.   . . .

"A natural distinction exists between these races which was not created neither can it be abrogated by law, and legislation which recognizes this distinction and provides for the peculiar wants or conditions of the particular race can in no just sense be called a discrimination against such race or an abridgment of its civil rights.   . . .

"The right of the individual, as affected by the question in hand, is to secure equal advantages in ob-

44—66 KAN.

taining an education at the public expense, and where that privilege is afforded him by the school authorities, he cannot justly claim that his educational privileges have been abridged, although such privileges are not accorded him at the precise place where he most desires to receive them.''

The syllabus of the case of *Ward v. Flood*, 48 Cal. 36, 17 Am. Rep. 405, is as follows :

"The opportunity of instruction in public schools, given by the statute to the youth of the state, is in obedience to the special command of the state constitution, and the privilege thereby granted is a legal right, as much so as a vested right in property.

"The clause in the fourteenth amendment to the constitution of the United States, which forbids a state to 'deny to any person within its jurisdiction the equal protection of the laws,' did not create any new legal rights, but operated upon legal rights as it found them established, and declared that such as they were in each state, they should be enjoyed by all persons alike.

"The legislature cannot, while providing a system of education for the youth of the state, exclude from its benefits children merely because of their African descent.

"The law providing for the education of children of African descent in separate schools, to be provided at the public expense the same as other public schools, is not in conflict with the constitution of this state, nor in conflict with the thirteenth and fourteenth amendments to the constitution of the United States.

"When such law exists, colored children may be excluded from schools established for white children, provided schools for colored children are established, affording the same facilities for education ; but if such schools for colored children are not established, they cannot be excluded from the schools kept for white pupils.''

Other decisions are equally clear.

The fact that laws of this character have been in force for many years in many states and in the district of Columbia, and that no question as to their validity has ever been presented to the supreme court of the United States, discloses a remarkable consensus of opinion on the part of the bar of the country as to the result of such an appeal. A statute of the state of Louisiana required railway companies carrying passengers in their coaches in that state to provide equal, but separate, accommodations for the white and colored races, by providing two or more passenger-coaches for each passenger-train, or by dividing the passenger-coaches by a partition so as to secure separate accommodations. In affirming the constitutionality of this law, the supreme court of the United States sustained its opinion by citing the decisions of the state courts upon the question under discussion, and said :

"The object of the amendment was undoubtedly to enforce the absolute equality of the two races before the law, but in the nature of things it could not have been intended to abolish distinctions based upon color, or to enforce social, as distinguished from political equality, or a commingling of the two races upon terms unsatisfactory to either. Laws permitting, and even requiring, their separation in places where they are liable to be brought into contact do not necessarily imply the inferiority of either race to the other, and have been generally, if not universally, recognized as within the competency of the state legislatures in the exercise of their police power. The most common instance of this is connected with the establishment of separate schools for white and colored children, which has been held to be a valid exercise of the legislative power even by courts of states where the political rights of the colored race have been longest and most earnestly enforced." (*Plessy*

*v. Ferguson*, 163 U. S. 537, 544, 16 Sup. Ct. 1138, 41 L. Ed. 256.)

The act of the legislature of 1879 providing for the education of white and colored children in separate schools of cities of the first class, except in the high school, is, therefore, in all respects constitutional and valid.

Finally, it is asserted that the educational facilities in fact provided for plaintiff's child are not equal to those afforded white children of the same age and attainments residing in the same neighborhood. The evidence has been examined and upon the whole no substantial discrimination is disclosed. True, for the accommodation of a numerous white population a much larger and more imposing school building is provided than that set apart for the few colored children in the district. This, however, is but an incidental matter and necessarily unavoidable in the administration of any extended school system. Schoolhouses cannot be identical in every respect; and parents cannot, on this acount, dictate the one their children shall attend. As was said in *People, ex rel. King, v. Gallagher*, supra:

"It is quite impracticable for the authorities to take into account and provide for the gratification of the taste, or even the convenience of the individual citizen in respect to the place or conditions under which he shall receive an education. . . . Equality and not identity of privileges and rights is what is guaranteed to the citizen."

No substantial right of the plaintiff having been violated, the writ is denied.

All the Justices concurring.